[Sac. No. 1949. In Bank.—November 20, 1912.]

CHAMPION GOLD MINING COMPANY (a Corporation), Appellant, v. THE CHAMPION MINES (a Corporation), Respondent.

VENDOR AND VENDEE—OPTION FOR PURCHASE OF MINING PROPERTY—FAILURE TO COMPLY WITH CONDITIONS AS TO PAYMENTS — NON-WAIVER OF DEFAULT—FORFEITURE.—Where an option for the purchase of mining property is conditional upon the vendee's making certain payments of the purchase price at stated intervals, and also payments of a certain percentage of the gross amount of any clean-up, to be applied to the purchase price, within ten days of the clean-up, and expressly provides in regard to such payments that "time is of the essence of this option," and that "upon the failure to make any payments above specified, or upon the breach of any agreement herein provided," all rights of the vendee shall cease and all payments theretofore made shall be forfeited, an inexcusable failure of the vendee to make a payment on account of such clean-up, when the same should be paid according to the agreement, terminates his rights under the option, and makes it impossible for him to enforce the same, in the absence of a waiver on the part of the vendor.

ID.—VENDEE IN POSSESSION—VENDOR'S RIGHT OF RE-POSSESSION.—Under such circumstances, it is immaterial that the vendee is in possession under the option. His right to the possession is only such as the contract gives, and if the contract substantially provides

that the right of possession shall cease upon the failure to perform a specified condition, the failure to perform such condition entitles the vendor to the immediate possession of the property. No notice by the vendor is essential to terminate the rights of the vendee. His default, unexcused and not waived, *ipso facto* terminates them.

ID.—SURRENDER OF POSSESSION BY VENDEE—TENDER OF PAYMENTS DUE AFTER DEFAULT—DEMAND FOR POSSESSION.—Where after such a default of the vendee, the corporate vendor, without having waived the default, by formal resolution of its board of directors, declared the option agreement to be terminated and directed its secretary to immediately take possession of the property, it became incumbent upon the vendee, unless the vendor receded from its determination, to surrender possession on demand therefor. A tender of all the amounts due, made subsequent to such default, could not avail the vendee, even if such tender was made prior to actual service of demand for possession.

ID.—WAIVER OF DEFAULT—UNACCEPTED PROPOSAL FOR WAIVER.—After the right of the vendor to retake possession had become fixed by reason of the vendee's default, its unaccepted proposal of certain terms and conditions upon which the default would be waived, including the payment of a larger amount of money than that due under the terms of the contract, and charges that the vendee would not have been required to pay thereunder, did not operate to waive the default.

ID.—ACTION BY VENDEE TO RECOVER POSSESSION—PLEADINGS—FAILURE TO CONSENT TO VENDOR'S REPOSSESSION.—An action by the vendee, after the vendor had taken possession of the property on account of such default, brought solely to recover its possession, to obtain an accounting as to its proceeds while in the vendor's possession, and to recover damages caused by the alleged unlawful withholding, is not an action of forcible entry, and the failure of the defendant to deny the allegations of the complaint showing that the plaintiff did not consent to the taking of possession by the defendant is immaterial.

ID.—RECOVERY OF PURCHASE PRICE—ENCUMBRANCE ON VENDOR'S TITLE. In such action, the right of the vendee to recover a part payment of the purchase price of the property is not in issue, nor can it avail itself of the fact that the vendor's title to the property was encumbered.

ID.—VENDEE NOT ENTITLED TO POSSESSION WITHOUT COMPLIANCE WITH CONTRACT.—Notwithstanding the title of such vendor is defective or encumbered, the vendee is not entitled to remain in possession without complying with the conditions of the contract as to payment.

JURY TRIAL—PRACTICE—DIRECTING VERDICT FOR DEFENDANT.—On a trial by jury, it is proper for the court, after the evidence on the

part of the plaintiff was closed, to direct a verdict for the defendant, where the evidence is such that if the case had been allowed to go to the jury, and it had found in favor of the plaintiff, the court would have been compelled, on motion to that effect, to set aside the verdict and grant a new trial, on the ground of insufficiency of evidence to sustain the verdict.

APPEAL from a judgment of the Superior Court of Nevada County and from an order refusing a new trial. George L. Jones, Judge.

The facts are stated in the opinion of the court.

J. M. Walling, for Appellant.

Metson, Drew & Mackenzie, Fred Searls, and Horatio Alling, for Respondent.

ANGELLOTTI, J.—This is an appeal by plaintiff from a judgment in favor of defendant, and from an order denying its motion for a new trial.

The action was one to recover possession of certain mining property and damages for the detention thereof. A jury was impanelled to try the case. After the evidence on the part of the plaintiff was closed, the trial court, on the motion of the defendant, directed the jury to return a verdict for the defendant. This was done, and thereupon judgment was given for the defendant. The action of the trial court in thus instructing the jury is alleged to have been erroneous, it being claimed that plaintiff made a sufficient case to support a verdict in its favor.

Considering the evidence in the light most favorable to plaintiff, the facts shown are substantially as follows:

Plaintiff is the assignee of all the rights of W. S. Phillips, George E. Fitzgerald, and W. T. Stewart under a contract executed by them and defendant corporation on December 18, 1909. By this contract defendant corporation granted to said Phillips, Fitzgerald, and Stewart "the option to purchase all of its mines and mining properties situated in the county of Nevada, state of California, at the total price of $347,000 upon the following terms and conditions, to wit:" The purchase price was to be paid in installments, nine thousand five

hundred dollars on or before January 1, 1910, twelve thousand five hundred dollars on or before July 1, 1910, and other installments on January 1 and July 1 of each year until the final installment of one hundred and thirty-seven thousand dollars, which was to be paid on or before January 1, 1913. Possession of the property was to be delivered to Phillips and his associates upon the making of said first payment of nine thousand five hundred dollars, and a deed was then to be placed in escrow by defendant conveying to them a clear, unencumbered, and marketable title to said mining property. Phillips and his associates were to have the right to operate the mines, they agreeing to expend a sum not less than one hundred thousand dollars in the development and operation of the mines during the first year, and to pay defendant ten per cent of the gross amount of bullion obtained at clean-ups, which amounts were to be applied upon the installments upon the purchase price. They were "to pay all taxes on said properties," and to keep the same free from all liens and encumbrances arising or growing out of their possession of said mines or the operation thereof. It was provided that "any of the above payments, other than the said first payment of $9,500, may be paid within ten days after the above specified dates, otherwise in all particulars, time is of the essence of this option." It was further provided as follows: "Upon the failure to make any of the payments above specified in accordance with the terms hereof, or upon the breach of any of the agreements herein provided, all payments theretofore made shall be forfeited and said corporation shall have the right to immediately re-enter and take possession of said properties and receive return of said deed placed in escrow."

The first payment (nine thousand five hundred dollars) having been made, plaintiff went into possession of said property on or about January 12, 1910, and proceeded with the development and operation of said mines, and continued in such possession and operation until April 26, 1910, when defendant took possession, claiming that all rights of plaintiff under said contract had terminated. It was to recover such possession that this action was brought by plaintiff on July 8, 1910, two days prior to the day on which it would be

in default for a failure to make the second payment, one of twelve thousand five hundred dollars, due July 1, 1910.

At the time of the first payment, defendant placed in escrow, in the Bank of California, a deed of said property subject to the terms and conditions of said agreement. The property was at that time, according to an undenied allegation of the complaint, encumbered by a mortgage placed thereon by defendant "in a sum of money in excess of" thirty thousand dollars, and according to the complaint and the proof, by a lien for unpaid state and county taxes for the year 1909, amounting to $1,477.64, being the second installment of the taxes for said year, payable when the contract was executed but not delinquent until the fourth Monday of April, 1910.

On April 19, 1910, plaintiff had been operating the mines for over two months, and had extracted at clean-ups bullion of the value of about twenty thousand dollars, but had not paid any portion of the ten per cent thereof to defendant. It cannot successfully be disputed that plaintiff's evidence shows that on April 1, 1910, at least $658.69 was due defendant under the provision requiring the payment of ten per cent of the gross amount extracted at clean-ups. Indeed, according to Fitzgerald's written acknowledgment on April 2, 1910, the amount due April 1st was $975.58.

Fitzgerald was at all times the general manager of plaintiff in this state, and one Thomas A. Kelly was superintendent of the mine and in possession thereof for the plaintiff. On March 17, 1910, defendant sent a formal letter to Fitzgerald, as such manager, signed by its president and secretary and attested with its corporate seal, notifying him that plaintiff was delinquent in the matter of paying to defendant ten per cent of the clean-ups as made. The letter contained the following statements, among others not material here: "On February 7, 1910, we wrote you in reference to this matter. You replied on February 9, 1910, promising to attend to this matter. You have now been in possession of the property for about two months. We know that you have had very many clean-ups, both of tributers and of company rock, amounting to several thousand dollars. According to our contract, we are entitled to a full statement and ten per cent

CLXIV. Cal.—14

of the gross clean-ups. As you have not replied to our letter of February 7th, and have given us no statement and no payments, we hereby wish to inform you that we shall hold you strictly accountable to the letter and spirit of the contract. Kindly send us at once a statement of the total amount you have taken from the mines since they have been in your possession, and send us a check for ten per cent of that amount. We do not desire in any way to hinder you in your operations, but we must insist, and do insist, upon a strict compliance with the contract; if said statement, accompanied by a check for ten per cent of the amount taken out, is not received by us, we shall immediately take steps to take possession of the property, as provided in the contract. Kindly understand we do not wish to hamper you in any way, but we do insist that you must keep up to the letter and spirit of the contract. We hereby demand, as is our right, at the close of each and every month, you send us a verified statement of the total product for the month, and send us a check for ten per cent of said amount.'' On April 2d, Fitzgerald sent by mail to defendant's president at San Francisco, a draft on one Phillips in Chicago for $975.58, with a statement showing such amount to be the amount due on clean-ups. On April 4, 1910, defendant by letter acknowledged receipt of the statement and draft, and said it would forward the same for collection, trusting it would be honored when presented. It was duly presented to Phillips for payment, but payment was refused by him. On April 13, 1910, the secretary wrote Fitzgerald as such manager that he had been directed to inform him that the draft had not been accepted and ''is being returned unpaid, and also to ask him to state by return mail what he proposed to do in these matters, and what might be expected in the future.'' On April 14, 1910, Fitzgerald replied to this letter, expressing great surprise that the draft should not have been honored, and promising that he would pay all amounts due in a short time. A telegram was produced on the trial showing that he had been expressly authorized by Phillips to draw on him for ''five hundred'' only. On April 18, 1910, he again wrote defendant's president inclosing on account of royalties his personal check for five hundred dollars on the Citizens Bank of Nevada City. This check was never paid, being marked ''No funds,'' Fitzgerald stating that

he had funds in the bank when he drew the check, but that
he withdrew the same before its presentation for the purpose
of preventing payment.

On April 19, 1910, at a regular meeting of the board of di-
rectors, the following resolution was adopted, viz.:

"Whereas, W. S. Phillips, George E. Fitzgerald and W. T.
Stewart, have broken that certain contract, made and entered
into between the said parties and The Champion Mines, on the
18th day of December, 1909.

"Now, Therefore, it is hereby resolved, that said agreement
be, and it is hereby terminated and canceled, and B. W. Shoe-
craft, secretary of this corporation, be and he is hereby author-
ized and directed for and on behalf of this corporation, and
as its act and deed, to immediately take possession of all the
properties of this corporation covered by said contract."

On April 20th or 21st, 1910, defendant's president and sec-
retary went to the mine, and the secretary there delivered to
Mr. Kelly, the superintendent in charge, a duly certified copy
of this resolution. According to Kelly's testimony, he told
them they would have to see Fitzgerald about it, and left the
paper on the desk or handed it to the secretary. Fitzgerald
came into the office while they were talking. According to
Fitzgerald's testimony the subsequent proceedings were as
follows: The president of defendant told him he had come
to take possession of the mine, because, among other reasons,
the royalties had not been paid, and he, Fitzgerald, at once
offered to pay all royalties due. The president retired for
a consultation with the secretary, and on his return said: "I
don't want to be too hard on you, Fitz. If you will pay me
$1,500 to $2,000 in royalties and $1,600 in taxes, I will let
you off." The tax thus referred to was that we have spoken
of, being the second installment for the year 1909. Fitz-
gerald declined to pay anything on account of the taxes, but
tendered the royalties demanded, which the president refused
to accept. At the close of the interview either the president
or secretary gave to Fitzgerald the certified copy of the reso-
lution we have referred to. According to Kelly, the president
said he had not then received the five hundred dollar check sent
April 18th, but that if it had been forwarded, Fitzgerald
would be likely to receive it back by return mail. The officers
of defendant left, and on April 26th they returned and took

possession of the property without plaintiff's consent, and defendant has ever since been operating the mine.

Plaintiff was entitled, of course, to continue in the possession and operation of the mining property as long as it fully performed the conditions imposed upon it by the agreement between its assignors and defendant.

The claim that there was a default in the matter of the payment of taxes was discussed in the opinion heretofore filed in this case by Department One of this court, and it was concluded that plaintiff was not required to pay the tax in question and that therefore there was no default in that matter. We adhere to the conclusion then reached in this regard, but as will appear from what follows, this conclusion is immaterial in the disposition of this appeal, and it will not be necessary to here set forth the reasons for that conclusion.

It was assumed in the department opinion, we are satisfied correctly, that one of the conditions imposed on plaintiff in the matter of remaining in possession and operating the mining property was the payment to defendant of ten per cent of the gross amount of each clean-up, within ten days of the making of the clean-up, the provision for ten days' grace as to payment being held applicable to "clean-up payments." The provisions of the agreement in this behalf may be held to have been waived by defendant to the extent stated in its formal letter of March 17, 1910, which stated that "we hereby demand, as is our right, at the close of each and every month, you send us a verified statement of the total product for the month, and send us a check for ten per cent of said amount." But there was nothing to indicate a waiver to any greater extent. Indeed, the letter was explicit to the effect that there must be a strict compliance with the contract, and that unless the amount already due was at once paid, and payments were made promptly at the close of each month on account of the clean-ups during such month, defendant would consider the contract at an end and would take possession of the property. Nothing was ever said or done by defendant to indicate that it would not maintain this position or that it would excuse any further delay in the matter of payments. And up to April 26, 1910, when a certified copy of the resolution of defendant's board of directors declaring the agreement terminated was served upon plaintiff's superintendent, neither any

payment nor tender of payment on account of such clean-ups
had been made, unless the check for five hundred dollars
dated April 18, 1910, which does not appear to have been ac-
cepted, and which was not, in fact, received by defendant un-
til after April 19th, be considered a tender of the amount
specified therein, an amount not sufficient to pay the percent-
age on clean-ups admittedly due not later than April 11, 1910.

The relative rights of the respective parties under the con-
tract before us are well established by the decisions in this state.
The plaintiff, as successor of Phillips, Fitzgerald, and Stewart,
held, *upon certain specified conditions,* the option to purchase
the mining property for three hundred and forty-seven thou-
sand dollars, with the right to possess such property and oper-
ate the mines thereon after the first payment on account of the
purchase price had been made, during the life of the option, and
having made such first payment was in the possession of and
operating the property. Among the conditions were some re-
quiring the making of certain payments within ten days of cer-
tain specified dates, and one requiring the payment of ten per
cent of the gross amount of any clean-up (to be applied on the
purchase price) within ten days of the making of the clean-up.
Although it is held that where mines or mining properties are
the subject of contract, time is of the essence, independent of
any express stipulation inserted in the instrument (see *Skoo-
kum Oil Co.* v. *Thomas,* 162 Cal. 539, [123 Pac. 363]), it was
expressly provided in regard to the payments that "time is of
the essence of this option," and it was substantially provided
that "upon the failure to make any payments above specified,
or upon the breach of any agreements herein provided," all
rights of the holders of the option shall terminate and all
payments theretofore made by them shall be forfeited. Such
is the clear effect of the provisions contained in the agreement.
Under such circumstances it is well settled that an inexcus-
able failure on the part of the holder of the option to make
a payment when the same should be paid according to the
agreement, terminates his rights under the option, and makes
it impossible for him to enforce the same, in the absence of
waiver on the part of the other party. (See *Oursler* v.
*Thacher,* 152 Cal. 739, [93 Pac. 1007] ; *Glock* v. *Howard,* 123
Cal. 1, [69 Am. St. Rep. 17, 43 L. R. A. 199, 55 Pac. 713].)

It can make no difference that the vendee is in possession under the option His right to the possession is only such as the contract gives, and if the contract substantially provides that the right of possession shall cease upon the failure to perform a specified condition, the failure to perform such condition entitles the owner to the immediate possession of the property. (See *Hegler* v. *Eddy*, 53 Cal. 597.) The evidence in the case at bar was not such as would sufficiently support a conclusion that the failure of plaintiff to make this payment on or before April 11th was in any way excusable, or that defendant prior to the adoption of its resolution of April 19, 1910, had in any way waived the making of such payment at the prescribed time, or waived any of its rights in consequence of such nonpayment. Plaintiff's rights under the contract were therefore on April 19, 1910, at an end, unless defendant elected to waive plaintiff's failure to comply with the terms thereof. Instead of doing anything of this kind, it, by its board of directors, adopted a formal resolution declaring the agreement to be terminated, and directing its secretary to immediately take possession of the property. We do not understand that any notice was essential to terminate plaintiff's rights under the contract. (See *Commercial Bank* v. *Weldon*, 148 Cal. 601, 608, [84 Pac. 171].) Its default, unexcused and not waived, *ipso facto* terminated those rights, and practically the only effect of the resolution was to express the determination of defendant corporation not to waive such default and that the contract was, by reason of the default, terminated, and to authorize the designated officer for and in its name to retake possession. Unless defendant elected to recede from this determination, nothing remained for plaintiff to do but to surrender possession on demand therefor. A tender of all the amounts due, made subsequent to such default, could not avail it (*Skookum Oil Co.* v. *Thomas*, 162 Cal. 539, [123 Pac. 363], even if such tender was made prior to the actual service of demand for possession. Even if we assume that what was said by defendant's president to Fitzgerald at the time of serving the notice on him could be taken as binding on the corporation, clearly nothing was said by him except to indicate certain terms and conditions upon which the corporation would waive the default. The right of defendant to possession being already

fixed and established, it had the right to prescribe any terms
it saw fit as the condition upon which it would waive and
forego that right, and reinstate plaintiff under the contract,
It is entirely immaterial that the payment demanded as
such a condition was larger than the amount that would
be due under the terms of the contract, and included charges
that plaintiff would not have been required to pay there-
under.   Plaintiff did not see fit to accept the offer made by
defendant's president, and that officer did not attempt to
waive any of the rights of his corporation in the matter.

From what we have said it is clear that if the case had
been allowed to go to the jury, and the jury had found in
favor of plaintiff, the court would have been compelled, on
motion to that effect, to set aside the verdict and grant a new
trial, on the ground of insufficiency of evidence to sustain
the verdict.   The trial court did not therefore err in directing
a verdict for defendant.

In view of what we have said the other points made in the
briefs of counsel for plaintiff require little discussion.

The denials and affirmative allegations contained in the
amended answer made sufficient issues as to the alleged per-
formance by plaintiff of the condition entitling it to remain
in possession of the property, and sufficiently showed the de-
termination of defendant to consider the contract at an end
by reason of the default alleged, and a taking of possession
in pursuance of that determination.   The failure to deny the
allegations of the complaint as to the manner in which de-
fendant obtained possession of the property from plaintiff's
employees was of no importance.   This is not an action of
forcible entry, but one brought long after the time within which
such an action could be brought, and the only effect of the alle-
gations of the complaint in this regard was to show that plain-
tiff did not consent to the taking of possession by defendant.
The demurrer to the answer was properly overruled.

Even if it be assumed, as claimed by plaintiff, that the
pleadings are in such condition as to prevent defendant from
asserting in this action that it is entitled to retain the nine
thousand five hundred dollars paid to it by plaintiff, a mat-
ter we by no means concede, nevertheless plaintiff was not
entitled to recover such money in this action, which is brought
by plaintiff solely to recover possession of the mining prop-

erty, and to obtain an accounting as to the proceeds obtained by defendant while wrongfully in possession, and to recover damages caused plaintiff by the alleged unlawful withholding. No other relief was suggested in the complaint by either allegation or prayer, and the right of plaintiff to recover the money was not in issue.

The fact that the title of defendant was encumbered by a mortgage for thirty thousand dollars, and by the lien for the taxes already referred to is of no avail to plaintiff in this action, involving, as it does, only the question of the right to the possession and operation of the mining property. Even if the title of defendant were in any way defective or encumbered, nevertheless plaintiff was not entitled to remain in possession without complying with the conditions as to payment. The principle involved is discussed in the opinion in *Garvey* v. *LaShells*, 151 Cal. 526, 531, [91 Pac. 498], and the cases therein cited.

There is no other matter requiring notice.

The judgment and order denying a new trial are affirmed.

Sloss, J., Henshaw, J., Lorigan, J., Melvin, J., and Beatty, C. J., concurred.

SHAW, J., dissenting.—I dissent. The opinion of the majority is based on the proposition that the plaintiff's right to pay the amount due for "clean-up" royalties and thereby to continue in possession of the mine had terminated before the offer of April 20th to pay said royalties was made. I think that the evidence shows a waiver of the forfeiture growing out of the failure to pay said royalties and that in holding that it does not, the majority opinion fails to consider the true rules of law applicable to such cases. The summary of Professor Pomeroy in his work on contracts has been accepted for many years as a correct statement of the law on this subject. It is as follows: "The one who is entitled to insist upon a punctual performance by the other or else that the agreement be ended, may waive his right and the benefit of any objection he might raise to performance after the prescribed time, either expressly or by conduct; and his conduct will operate as a waiver when it is consistent only with a purpose on his part to regard the contract as still subsisting, and not ended

by the other's default." (Pomeroy on Contracts, sec. 394.)
In section 395, he states the well established rule that when the
right to a forfeiture is once waived, time is no longer essen-
tial as to the payments included in the waiver, that it cannot
again be made essential as to them, except by a notice again
fixing the time of the payment, and that the time so fixed
must be reasonable under all the circumstances.   In section
397, he proceeds to say that the time thus newly fixed by no-
tice may again be waived by conduct, and that "if the time
is once allowed to pass and the parties still go on negotiating
for the completion of the purchase, this conduct amounts to
a waiver, and time is then no longer essential."

With these rules in view the evidence sufficiently establishes
the waiver.   As the trial was before a jury and the court
directed a verdict for the defendant, the rule prevails that
every fact in issue favorable to the plaintiff, of which there
was substantial evidence, must be considered as proven and
evidence inconsistent therewith must be disregarded.   For-
feitures are not favored either in law or equity.   In consid-
ering the effect of the evidence due weight must be given to
both of these propositions.

While it must be conceded that the language used in the
agreement clearly includes the clean-up payments among those
as to which time is essential, it is at least doubtful from the
whole case and from the nature of these payments whether
the parties at the time really understood that it had that effect.
The main object of the provision that time was essential and
that a forfeiture would result from a failure to pay promptly,
obviously was to secure prompt payment of the installments
of the price agreed upon.   The clean-up payments were in fact
advance payments on those installments and the contract so
declares.   It must be admitted that where payments as to
which time is made essential are for very small amounts, be-
coming due at irregular intervals, and both the amounts and
dates of payment are determined by subsequent events brought
to pass in part by the acts of third persons and are not fixed
in advance by the contract itself, it would be much more
probable that prompt payment, or forfeiture for nonpayment,
would be waived than it would be with regard to regular in-
stallments of the price to be paid at times fixed by the agree-

ment. Consequently, slighter evidence would suffice to establish such waiver.

The contract fixed no definite time for making clean-up payments. The amounts thereof depended on the amount of precious metal obtained. Both amount and date became known for the first time when the clean-up was made. At the time of the sale and until the supposed forfeiture, the operations at the mine were largely carried on by "tributers," persons taking out ore independently for a percentage of its value. Clean-ups were made for their benefit as the ore was mined. By the language of the contract payment of the royalty upon each of these clean-ups was to be made within ten days thereafter and a failure by the plaintiff as to any one of them, would, *ipso facto,* forfeit all of the plaintiff's rights. According to the testimony of Fitzgerald the plaintiff had paid twelve thousand five hundred dollars on the price, and it had a very substantial interest at stake. Four or five "tributers" clean-ups were made between February 1 and March 4, 1910, but the respective dates and amounts were not proven. The following are the dates of other tributers clean-ups shown and the amounts are the royalties due thereon: March 4, $43.02; March 7, $91.22; March 11, $26.42; March 14 (3 clean-ups), $51.17; March 17, $5.47; March 23, $86.23; March 20, $2.08; March 30, $11.97; April 1, $3.94; April 7, $28.72; April 8 (2 clean-ups), $66.67. I mention these to show the irregular dates and the varying amounts of royalty payments. The plaintiff's manager testified that the nature of the business was such that it was a very difficult matter to ascertain at any time the royalties that were then due. None of the above amounts were paid, and, under the contract, at the expiration of ten days from each clean-up a forfeiture of all of plaintiff's interest would have occurred if there had not been a waiver by the defendant. Obviously there was such waiver as to all clean-up royalties that became due on or before March 17th, the date of the letter of the defendant to plaintiff mentioned in the majority opinion. This letter was received by Fitzgerald, the manager of the plaintiff, on March 18th. The statement therein demanded of him was not made until April 2d. He then rendered the statement accompanied by a draft to cover the royalties shown to be due thereby, although, in fact, the

ten days' grace had not expired as to all of them. The evidence shows that this draft was drawn in good faith and with the belief that it would be paid. It was not paid on presentation and thereupon, under date of April 13th, defendant wrote to Fitzgerald, informing him that the draft had not been accepted and that the "board of directors desire you to state by return mail what you propose to do in these matters and what may be expected in the future." Fitzgerald received this letter on April 14th. He immediately replied saying that he would begin payments on the royalties on April 20th, by applying thereon all the proceeds of tributers' rock, and that he expected to pay it all up in four weeks, as the ore was becoming more valuable. On April 18th, Fitzgerald sent to defendant his personal check for five hundred dollars to apply on the amount due from plaintiff on royalties. On April 19th, before the last check was received, the defendant's board of directors made and adopted a resolution declaring the agreement ended and authorizing its secretary to immediately take possession of the mine. No officer or agent of the plaintiff was present and it had no knowledge of this action at the time. It is obvious that the resolution could not of itself affect the plaintiff's rights. A copy of it was served on the plaintiff on April 20th, and immediate possession of the mine was then demanded. Plaintiff's manager thereupon offered to pay all royalties then due, which defendant refused to accept unless plaintiff also paid fifteen hundred dollars in taxes which it was not bound to pay. Plaintiff was allowed to continue in the possession and operation of the mine until April 26th. No previous notice had been given that this demand for possession would be made on April 20th, or at any other time.

The defendant's letter of March 17th clearly shows a waiver of the forfeiture for all the defaults which had then occurred. It even went further and proposed a distinct alteration in the terms of the contract,—namely, that thereafter, instead of paying the royalty on each clean-up as it became due, the plaintiff should render an account at the close of each month and pay the royalties monthly according to such account. This alteration was accepted and acted upon by the plaintiff and this conduct must be accepted as a waiver of the strict terms of the contract with respect to royalties on clean-ups. In the letter

of April 13th, after the default in the payment of the draft, the defendant did not insist upon the right of forfeiture which, technically, had accrued to it by reason of the dishonor of the draft and the failure to pay the amount due for the March royalties. On the contrary, it desired plaintiff to say what it proposed to do in the matter and to state what it could expect in the future. Defendant evidently then regarded the contract as still subsisting, and not as having terminated with the default, and the language of the letter plainly shows a desire to negotiate for its future performance. This, under the doctrine above stated, was a clear waiver of the previous defaults. If this case had been submitted to a jury and a verdict for the plaintiff rendered, this waiver would have been supported by the evidence, and it should be regarded here as an established fact. Under the change in the terms made by the letter of March 17th no additional payment would become due until May 1st. In the mean time none would become due so as to cause a forfeiture, unless by some notice or demand the defendant informed the plaintiff that after a reasonable time it would no longer stand by the proposition of March 17th.

The result is that the time, having been once allowed to pass for the March payment, became no longer essential as to that payment, and it could not again be made essential, except by notice fixing a new date upon which such payment would be demanded or a forfeiture declared. Payment was not wholly waived, but payment at the exact time was waived, when the defendant, in effect, asked plaintiff to negotiate for a future date. Plaintiff having replied by a promise of payment at an indefinite time, it was necessary for the defendant, if it still intended to insist upon a forfeiture on account of such payment, to fix a new date and give the plaintiff notice thereof a reasonable time in advance. It could not work a forfeiture by demanding immediate possession on account of a prior default which it had waived in this manner.

The offer of the plaintiff to pay the amount due, being made at the time of the unannounced demand for possession, was in time. It should have been accepted by the defendant. The demand of the defendant for more than was due was, in effect, a rejection of the offer. The defendant had no right to take possession and in doing so it committed a wrongful act. There is nothing in the evidence to show that its possession became

rightful before this suit was begun.    It follows that the court erred in directing the jury to return a verdict for the defendant.    For these reasons I think the judgment should be reversed.