[L. A. No. 19357.   In Bank.   June 26, 1947.]

WM. F. ALDER et al., Plaintiffs and Respondents, v. JOSE DRUDIS et al., Appellants; FREDERICK G. STOEHR et al., Cross-Defendants and Respondents.

Marcus L. Roberts, in pro. per., Geo. W. Rochester, John W. Preston and John W. Preston, Jr., for Appellants.

Frederick G. Stoehr, in pro. per., Conroy & Conroy, Edward L. Conroy, Chambers & Lyman and Robert Chambers for Respondents.

CARTER, J.—In this action in claim and delivery and for declaratory relief, with a cross-complaint raising issues of fraud and misrepresentation, defendants and cross-complainants Drudis and Roberts appeal from an adverse judgment.

In 1941, plaintiff William F. Alder, an inventor, was the holder of United States letters patent on a device for producing third dimensional motion pictures, known as a polyscope. Plaintiff McMahon, in return for an interest in the patent, was engaged in efforts to develop and commercialize the device. Plans were under consideration for the organization of a development corporation and sale of its stock. One John H. Morton, a possible investor, discussed the advisability of putting money in the project with his landlord, an attorney named Marcus L. Roberts. Mr. Roberts immediately expressed a desire to investigate the matter with the thought that the development might be entirely financed by one Jose Drudis.

Negotiations followed which led to the simultaneous execution on December 17, 1941, of two written agreements, which are to be considered as forming a single contract. One writing, executed by Alder and his wife and McMahon, recites that the Alders are the sole owners of letters patent dated June 6, 1939, and that McMahon is desirous of acquiring the entire interest in the letters patent as trustee for himself, Drudis, the Alders, and others, for the purpose of forming a corporation and transferring the letters patent to it in exchange for stock as provided in a supplemental agreement, the Alders to receive one-tenth of the nonassessable stock. Following these recitals the writing provides that in consideration of $5,000 paid by Drudis and other considerations received from McMahon, the Alders do sell, assign, and transfer to McMahon as trustee, the whole right, title, and interest in the letters patent, subject to the obligation of McMahon to assign and transfer said letters to the corporation when formed. As a further part of the consideration it is also agreed that McMahon is to receive from the Alders, for the same trust use and purpose, all existing apparatuses of the patent, together

with all drawings and dyes for manufacturing same, and all renewals, extensions, or reissues of the patent; also any further patents applied for by the Alders, and any improvements of or concerning the apparatus.

The second or supplemental writing refers to the terms of the first and the $5,000 there mentioned, and recites the willingness of Drudis to advance that sum and to pay into a corporation to be formed an additional sum for a beneficiary interest in the patent. It then provides as follows: 1. That Drudis will pay Alder $5,000. 2. That McMahon will take an assignment of the letters patent from the Alders and will hold it in trust, and thereafter will immediately cooperate with Drudis in forming a corporation. That when the corporation is formed McMahon will transfer to it the letters patent and all other things received from the Alders. 3. That the Alders will receive one-tenth of the stock issued by the corporation, Drudis 25 per cent, Roberts 12½ per cent, and Morton 12½ per cent. (There is no provision for issuance of any stock to McMahon or for disposition of the remaining 40 per cent.) 4. That Drudis will advance money for incorporation and will either pay in or make available for the corporation's use the total sum of $20,000, made up partly of the $5,000 paid to the Alders, and an allowance of $2,000 to form the corporation. That it is agreed that Drudis will receive either preferential stock in the corporation or the stockholders will assign all earnings and dividends declared, so that, other than the Alders, none of the stockholders except Drudis will receive any earnings, profits, or dividends until such time as he shall receive $20,000, after which McMahon will receive $7,500. That thereafter the dividends will be paid in accordance with the shares of stock held by each stockholder. Lastly, it is agreed that McMahon will pool and vote his stock with Drudis; that McMahon will be president of the corporation and Roberts the secretary-treasurer.

In the negotiations leading to the execution of these documents and throughout all proceedings thereafter Roberts was acting as attorney and agent of Drudis. Drudis paid $5,000 to the Alders upon execution of the contract, and the letters patent were handed to Roberts. Subsequently, McMahon telephoned Roberts stating that it was advisable to move the polyscopes from Pasadena to Hollywood, where they would be more accessible, and that he was looking for a place to keep them. Roberts stated that he had plenty of room. He

called for the devices about December 27, 1941, and placed them in his home where the parties could examine them and take tests. Later, with acquiescence of all, he took them to the Acme Tool Company to be redesigned. About two and a half months later he got them back and had them until they were produced in court on the trial of the present action.

Roberts proceeded with steps toward incorporation and about January 6, 1942, filed for record in Los Angeles County, articles of incorporation under the name of Third Dimensional Picture Corporation. The Alders and McMahon claim that they were not told of this action. About January 19th, Roberts consulted the attorneys who had procured the letters patent for Alder regarding the contemplated changes in the polyscope. This interview, followed by an adverse report from the attorneys and further inquiry by Roberts indicated to him that he had been misled by fraud and deceit on the part of the Alders and McMahon, in that the basic idea underlying the invention had been the subject of prior patents, of which he was unaware, and the polyscope possibly could be redesigned in such fashion as not to infringe the Alder patent.

About January 20th, at a stormy interview, Roberts gave written notice of rescission He also telegraphed Alder demanding a return of the $5,000 paid him. On January 23d, on behalf of himself and Drudis, he gave notice to the attorney for the Alders and McMahon of election to rescind the contract on the ground that plaintiffs were guilty of fraud and deceit in its procurement. This writing made claim for Alder's repayment of the $5,000 to Drudis, and contained an offer to restore all parties to their *status quo* and to return all things which had come into the possession of Roberts and Drudis. Upon rejection of the demand Roberts, on January 29th, filed a suit against Alder et al., in the superior court, based upon charges of fraud. After the case had been on trial for seven days, but before judgment, it was dismissed by Roberts.

Meanwhile, and on January 26th, and thereafter, plaintiffs demanded possession of the polyscopes. In June, 1943, they brought the present action in claim and delivery and for declaratory relief against Drudis and Roberts. Count one, in claim and delivery, alleged that plaintiffs were the owners of the polyscopes and letters patent; that since January 26, 1942, defendants had wrongfully withheld and retained pos-

session of them, to plaintiffs' damage to date in the sum of $36,000, and continuing damage in the sum of $2,000 a month; and that the reasonable value of the property was approximately $50,000. The prayer of this count was for possession of the property, or its reasonable value, together with charges for the reasonable value of the use of the property during the time of wrongful withholding.

Count two was for declaratory relief. It alleged the making of the written agreement, defendants' refusal to perform after January 26, 1942, and plaintiffs' contention that by virtue of defendants' breach they had waived and terminated all rights under the agreement and it should be cancelled. The existence of an actual controversy was also alleged, with a prayer that the court determine and adjudge the rights and liabilities of the parties under the terms of the agreement.

To this pleading defendants responded with an answer and a cross-complaint, bringing in as additional parties cross-defendant the attorney for the Alders and Morton, and seeking rescission of the agreement for fraud and deceit, return of the $5,000, or as an alternative to rescission, damages in the sum of $10,000.

The case, on issues joined under plaintiffs' first cause of action in claim and delivery, was tried before a jury which returned a verdict in favor of plaintiffs for possession of the polyscopes and for $20,000 damages. On issues joined under the cross-complaint the cause was heard before a jury sitting in an advisory capacity, and separate advisory verdicts were returned in favor of each of the cross-defendants. As to the second cause of action, which was for declaratory relief, the cause was heard by the judge sitting without a jury.

At the close of the trial the court entered judgment on the verdict under the first cause of action that plaintiffs recover possession of the polyscopes from defendants, together with $20,000 damages for the unlawful withholding, and costs. On issues joined by the other pleadings, the court made findings in substance as follows:

The court found that after January 20, 1942, defendant Drudis continually failed to perform the written agreement and that it was breached by the two written notices of rescission; that no misrepresentation, deception, or concealment of any material fact was practiced by plaintiffs in their dealings with Drudis and Roberts, and that after January 20th,

said defendants were in default under the terms of the agreement. The court further found that about December 27, 1941, defendants, having already taken possession of the letters patent, took possession of the only two polyscopes in existence; that the polyscopes were not delivered to defendants because of the payment by Drudis of $5,000 under the written agreement, but were delivered to defendants for safekeeping and so that they would be conveniently situated for use in carrying out the terms of the agreement; that Drudis and Roberts had the patent and polyscopes in their possession until April, 1943, since which time they have been in the possession of Drudis. Other detailed findings for plaintiffs relate to respective allegations of fraud, the existence of a controversy between the parties relating to their rights and duties under the agreement, and the wrongful termination of the agreement by defendants.

Following the findings, the court entered a second judgment (which, with the first, is to be considered one judgment), wherein it decreed (1) As to the second cause of action, that defendants breached and violated the written agreement and terminated their rights under it, and as to them the agreement is cancelled; that plaintiffs have immediate possession of the polyscopes and letters patent; and that defendants deliver them over; (2) As to the cross-complaint, that cross-complainants take nothing and that plaintiffs have costs.

The first contention made by defendants on their appeal from the judgment is that of insufficiency of the evidence to support the advisory verdicts and findings against them on the issues of misrepresentation, fraud and deceit. On these issues the evidence was conflicting. Defendants claimed that plaintiffs represented that the idea for the polyscope was basically and fully covered by the letters patent here in question and that the polyscope was the original instrument designed to produce third dimensional motion pictures by the means employed. Later defendants purportedly discovered that two prior patents had been issued for similar devices—that is, devices which also employed a moving picture camera, two mirrors with one mirror moving toward and away from another mirror in the course of the operation of the camera, and a picture taken by having the camera look into one of these mirrors and by varying the relative distance between the stationary mirror and the movable mirror, in an effort to

produce a stereoscopic effect. The first prior, or original patent was obtained by a man named Cervenka in 1915, and it expired in 1932. The second prior patent was obtained about 1935, by Mr. Alder and one Merritt to whom he had made a one-half interest assignment as trustee, their device being known as the cinegraph. The polyscope patent here involved was obtained by Mr. Alder in 1939, and covered eleven claims for patentable refinements, improvements, or additions not found in the earlier devices. Defendants asserted that because of the prior patenting of the basic idea and concealment of that fact from them, and because of the necessity for redesigning the polyscope, they stood to receive nothing in return for their investment; that is, the basic idea passed into the public domain with expiration of the Cervenka patent and the claims for refinements and improvements granted by the polyscope patent could all be avoided in the redesigning of the device, so that the patent would not be infringed

Evidence on behalf of plaintiffs was to the effect that the Cervenka patent was defective and that a machine made according to its specifications would be wholly unworkable; that the Alder-Merritt device of cinegraph was also useless commercially. There was evidence that defendants made an investigation of the polyscope patent before the contract with Alder was signed and before Drudis paid his money to Alder; also that at defendants' first meeting with Alder, Roberts announced that they had investigated and were satisfied. Test films, demonstrating the possibilities of the device and its third dimensional qualities, were shown to Drudis and Roberts before the contract was signed. The Cervenka and cinegraph patents were matters of public record and open to inspection and comparison by defendants before they entered into the transaction. Mr. Merritt, the owner of an interest in the cinegraph, was called as a witness. He made no claim that his patent was infringed by the polyscope patent, or that the cinegraph had been stabilized, or that it was other than useless commercially.

There was testimony that when defendants were first introduced to Alder at Alder's home near Santa Cruz, and before any discussion had taken place, Roberts in substance said, "Well, Mr. Alder, we have come a long way to make this deal and I have a check for you for $5,000"; that at the same time he started to reach for his pocket, whereupon Mr. Alder

remarked, ''Well, Mr. Roberts, I think there are a number of things that we should go into,'' thinking that Roberts ''should hear all the trials and tribulations that I had undergone in producing commercial stereoscopy, since 1911 practically continuous effort on my part, that I felt that he should hear all of that''; but that Mr. Roberts said, ''Never mind about that Mr. Alder, we have made our investigation, I have made a thorough investigation and I am quite satisfied and we needn't waste time because this has been a long trip and I am tired and I have got to go back to Hollywood tomorrow and I think we can waive all of that and get right down to the business of the evening; I have some papers here . . . that I have prepared myself and I want you to read them and sign them and then I will give you your check for the $5,000. . . .''

Mr. Alder testified that despite this discouragement, he insisted upon relating some of the details of his efforts to produce the polyscope; that his statement to Mr. Roberts occupied ''probably forty continuous minutes,'' for he ''was meticulously careful to explain every step . . . gone through in developing stereoscopy'' because he realized that Mr. Roberts was a layman; but that Mr. Roberts finally interrupted his descriptions, reiterating that he had made his personal investigation, was thoroughly satisfied; that because the hour was getting late, he wanted to go into the matter of the contracts. He produced a cashier's check for $5,000 payable to Drudis. It was endorsed by Drudis and delivered to Alder, and the contracts were signed.

Defendants claimed to have been misled by a treatise given to them by McMahon entitled ''A New Method of Adding Depth to Motion Pictures,'' and published by Professor Curtis R. Haupt, a recognized optical physicist. Plaintiffs deny that they represented this document as referring to the polyscope, and their denial is supported by the fact that the title page of the pamphlet shows that it was published in May, 1933, some months before the polyscope was constructed and patented.

The charge of misrepresentation by plaintiffs of the terms of Alder's agreement with McMahon is immaterial so far as defendants are concerned, since they purported to buy an interest in the polyscope and not the interest, if any, which McMahon was acquiring or had acquired from Alder. Likewise immaterial is the claim that it would have been a physical impossibility for Alder to have produced a sensation of depth

in motion pictures by bodily weaving the camera back and forth. The material point was not how Alder originally conceived the thought of constructing a third dimensional motion picture machine but whether his idea resulted in a machine which would carry out his conception.

In view of the substantial evidence favorable to plaintiffs on the issues of fraud and misrepresentation, it cannot be said that the trial court's findings on those issues are insufficiently supported. Complaint is made by defendants of alleged errors in charging the jury and in rulings on the admission of evidence. These contentions need not be separately discussed. No prejudice is shown.

Proceeding therefore from the premise that there was no fraud, misrepresentation, or deception in the procurement of the contract, it remains to be determined whether plaintiffs were entitled to the scope of relief accorded them by the judgment on the first cause of action—that they recover the possession of the two polyscopes and have $20,000 damages for the unlawful withholding thereof by defendants— and by the judgment on the second cause of action—decreeing that defendants breached the contract and terminated all their rights under it and as to them it should be cancelled; that plaintiffs should have immediate possession of the polyscopes and letters patent; that defendant Drudis should immediately deliver the same to plaintiffs; that no relief be given under the cross-complaint; and that plaintiffs have costs.

Plaintiffs, in their election of the several remedies open to them, had the choice of accepting defendants' offer of rescission of the contract (which would have given them an immediate return of their property upon their repayment to defendants of the $5,000 received), or of treating the offer and the accompanying conduct as an anticipatory breach or repudiation of the contract (*Gold Min. & Water Co.* v. *Swinerton*, 23 Cal.2d 19, 28-30 [142 P.2d 22]; *Cobb* v. *Pacific Mutual Life Ins. Co.*, 4 Cal.2d 565 [51 P.2d 84]; 4 Cal.Jur. 10-Yr.Supp. (1943 Rev.) 196-9, § 274; Rest., Contracts, § 318). They took the latter course.

It is well settled in this state that one who has been injured by a breach of contract has an election to pursue any of three remedies, to wit: ''He may treat the contract as rescinded and may recover upon a quantum meruit so far as he has performed; or he may keep the contract alive, for the benefit of both parties, being at all times ready and able

to perform; or, third, he may treat the repudiation as putting an end to the contract for all purposes of performance, and sue for the profits he would have realized if he had not been prevented from performing." (*Sobelman* v. *Maier*, 203 Cal. 1 [262 P. 1087]; *McConnell* v. *Corona City Water Co.*, 149 Cal. 60, 64-65 [85 P. 929, 8 L.R.A.N.S. 1171]; *Lemle* v. *Barry*, 181 Cal. 1 [183 P. 150]; see, also, *House* v. *Piercy*, 181 Cal. 247 [183 P. 807]; 4 Cal.Jur. 10-Yr.Supp. (1943 Rev.) 196-199, § 274.)

The first remedy was of no avail to plaintiffs. As to the second remedy, plaintiffs made no effort to keep the contract alive for the benefit of all of the parties, or to procure the $13,000 needed for financing from other sources, or to proceed with the enterprise. It is evident that they elected to treat the anticipatory breach as putting an end to the contract for all purposes of performance. This being so, they were in·a position to sue for damages. However, they made no direct claim to damages but instead sought declaratory relief, asking the court by their second cause of action, to "determine and adjudge the rights and liabilities of the parties under the terms of the written agreement." They also asked for any further relief to what they might be entitled.

■ Damages measured by the prospective profits to be derived from a successful promotion of the enterprise as finally reflected in the amounts which would come to plaintiffs individually as dividends declared in favor of the shareholders of the proposed corporation, were probably too speculative and conjectural for estimation, particularly in view of the evidence of uncertainty as to the commercial possibilities of the polyscope. At any rate they were not satisfactorily proved here. Any award made on this basis, therefore, would have been nominal. (Civ. Code §§ 3300, 3301, 3358, 3359; *Continental Car Na-Var. Corp.* v. *Moseley*, 24 Cal.2d 104 [148 P.2d 9]; *California Pr. Mfg. Co.* v. *Stafford P. Co.*, 192 Cal. 479 [221 P. 345, 32 A.L.R. 114]; *Lacy Mfg. Co.* v. *Gold Crown Mining Co.*, 52 Cal.App.2d 568, 574 [126 P.2d 644]; 8 Cal. Jur. § 38, p. 777.) Likewise, the value, if any, of the letters patent was undeterminable. The two polyscopes could have been duplicated at a construction cost of from $750 to $1,000 each. Damages based upon the proportionate value to each shareholder of the $13,000 which defendants were to advance for financing would have been inadequate, since this would have given plaintiffs but a small sum and would have left

them without patent or device. The trial court, therefore, concluded that damages would not afford an adequate remedy, and in lieu thereof it declared plaintiffs' right to a return of the polyscopes and letters patent and ordered delivery thereof to them. In other words, the trial court invoked the remedy of restitution for breach of contract, which in certain circumstances will be granted as an alternative to an award of damages.

The principle is declared in the Restatement, Contracts (p. 610, § 354), as follows: "If the performance received from the plaintiff by the defendant is the transfer of land, or of goods or choses in action of a unique character, and the defendant thereafter commits a total breach, the plaintiff can get a decree, on such terms as justice may require, for the specific restitution and retransfer of the property if the circumstances are such that other remedies are inadequate, and if (a) the subject of the property still exists and the interests of innocent purchasers for value and of the defendant's creditors will not be unjustly affected; and (b) the facts are such as to make restitution an available remedy under the rules stated in the other Sections of this Topic, except that instead of the requirement of an offer to return the consideration as in § 349, the decree for specific restitution may be made conditional on such return or on payment of its value." As an illustration, the following is given (p. 614, No. 7): "A transfers a patent right, with dies and tools, to B for the latter's promise to manufacture and to pay a royalty. B repudiates the contract and cannot respond in damages. A may be given a decree for restitution."

Damages and restitution are alternative remedies and an election to pursue one is a bar to invoking the other. (Rest., Contracts, §§ 381, 384, pp. 712, 718.) In 5 Williston on Contracts, revised edition, sections 1455, 1458, pages 4064, 4075, it is said: "The right of rescission and restitution generally exists as an alternative remedy to an action for damages where there has been repudiation or a material breach of a contract, . . . This choice of remedies was not allowed by the early English law, and there are still many exceptions and inconsistencies in the application of the rule, . . . But where the transfer is of goods or choses in action of unique character, or of exclusive privileges such as patents and copyrights, specific restitution will generally be granted." (See,

also, *DeMille Co.* v. *Casey,* 121 Misc. 78 [201 N.Y.S. 20];
*Hansen* v. *Hall Mfg. Co.,* 196 Iowa 1 [193 N.W. 568]; *Dow* v.
*Harkin,* 67 N.H. 383 [29 A. 846] [patent and tools].)

The doctrine has not been expressly declared in this state
but there are a number of cases in accord. In *Howlin* v.
*Castro,* 136 Cal. 605 [69 P. 432], the plaintiff placed a deed
in escrow to be delivered to the defendant upon performance
of his promise to care for and attend the plaintiff during his
remaining years. Defendant failed to care for plaintiff, and
the court ordered a redelivery of the deed to plaintiff. In
land cases it has been held that the vendor is entitled to re-
possession of the premises where the vendee has abandoned
them or has defaulted, and similarly restitution of lands and
equipment has been decreed in oil and gas lease cases. These
authorities are collected in the California Annotations to the
Restatement, Contracts, section 354. (See, for example, *Em-
pire Investment Co.* v. *Mort,* 169 Cal. 732 [147 P. 960];
*Champion G. Min. Co.* v. *Champion Mines,* 164 Cal. 205 [128
P. 315]; *Payne* v. *Neuval,* 155 Cal. 46 [99 P. 476]; *Acme Oil
& Mining Co.* v. *Williams,* 140 Cal. 681 [74 P. 296]; *Mc-
Adams* v. *Felkner,* 140 Cal. 354 [73 P. 1064]; *Downing* v.
*Rademacher,* 133 Cal. 220 [65 P. 385, 85 Am.St.Rep. 160];
*Sledge* v. *Stolz,* 41 Cal.App. 209 [182 P. 340]; *Coates* v.
*Cleaves,* 92 Cal. 427 [28 P. 580]; *Covington* v. *Lewis,* 83 Cal.
App. 8 [256 P. 277].)

In granting to plaintiffs the remedy of restitution and
in ordering the delivery to them of the polyscopes and letters
patent, the court should have made its decree for this specific
restitution conditional upon the return by plaintiffs to defen-
dants of the $5,000 received. The purpose of restitution as
a remedy for breach is the restoration of the *status quo ante*
as far as is practicable, and in the absence of qualifying cir-
cumstances, the plaintiff must return any consideration he
has received in order to obtain specific restitution. While
there is no literal rescission of the contract, the result reached
by the restitutionary remedy approximates that reached by
rescission. It is not necessary that plaintiff should have
made an offer to return the consideration, but the decree for
specific restitution may be made conditional upon such return.
(Rest., Contracts, § 349, p. 596; § 354, p. 611; 5 Williston on
Contracts, rev. ed., § 1460A, pp. 4082 et seq.) California au-
thorities dealing with the rescission of contracts illustrate this
rule. See cases collected in California Annotations to the Re-

statement, section 349, *supra;* Civil Code, sections 1691(2), 3408.

For these reasons, the trial court properly limited its judgment on the second cause of action to a return by defendants to plaintiffs of the polyscopes and letters patent, but it erred in failing to condition delivery upon a repayment by plaintiffs to defendants of the $5,000 received.

█ The remaining question is whether plaintiffs were also entitled to the relief granted by the judgment on their first cause of action—possession of the two polyscopes and $20,000 damages for the unlawful withholding. In their complaint, plaintiffs entitled this cause as one in "claim and delivery." However, in their supplemental brief, their position is clarified by their response to questions propounded by this court. These two questions, among others, were asked: "Is the cause of action in claim and delivery (a provisional remedy) asserted as an aid to restitution and as an election to seek that relief rather than damages?"; "Or is the cause of action for claim and delivery asserted entirely apart from the existence of any claim under or for breach of the contract? If so, what is the basis for such claim to relief apart from any claim under the contract?"

Plaintiffs' reply is: "Because of the repudiation of the contract by the defendants, the plaintiffs treated it as at an end. A perfectly legal action on their part. . . . Under this state of facts the plaintiffs had the following remedies: They could bring an action for damages for breach of contract; they could remain quiet and in the event that the defendants should bring an action against them they could then set up the breach of contract and the resulting damages in defense of such action. They elected to remain passive as to damages for breach of contract. The plaintiffs did avail themselves of the statutory remedy of claim and delivery to recover the polyscopes and, as authorized by the statute, they asked for the possession of their property and damages for its wrongful detention. The plaintiffs, unnecessarily we think, included a second cause of action for a declaration that the contracts were terminated. As we have seen, under the law applied to the acts of the parties, the contracts had been terminated and the court so held. The second cause of action may, therefore, be disregarded. There is no contention the contracts are not at an end."

█

This statement makes it clear that plaintiffs' first cause of action was not asserted as an aid to enforcement of the relief sought by their second cause. By their first cause they attempted to bring a simple suit for the recovery of property entrusted by them to another, a voluntary bailment, and asked damages for wrongful withholding, their theory being that the contract was at an end and eliminated from consideration. This theory of voluntary bailment is reflected in a finding of the trial court to the effect that the polyscopes were not delivered to the defendants because of their payment of $5,000 under the contract, but were delivered to the defendants "for safe-keeping and so that said polyscopes would be conveniently situated for use in carrying out the terms of the said agreement between the parties."

The fallacy in plaintiffs' reasoning is that the termination of the contract by defendants' anticipatory breach did not, as plaintiffs seem to assume, operate of itself to restore the status which existed prior to the making of the contract. Neither did it convert transfers made by reason of the existence of the contract into transfers made as though no contract had ever existed. Upon the election to treat the attempted rescission as an anticipatory breach, the rights of the parties culminated and the contractual relation ceased to exist, *except* for the purpose of maintaining an action for the recovery of damages or for restitution.

Although it may be true, as the court found, that the polyscopes were not delivered to the defendants because of their payment of $5,000 under the contract, it is also true, as the court further found, that they were delivered for safekeeping and so that they would be conveniently situated "for use in carrying out the terms" of the contract. The evidence shows beyond dispute that had there been no contract, there would have been no delivery of the polyscopes to defendants. The delivery was made in pursuance of the joint enterprise, and in fact one of the devices was taken by defendant Roberts to a concern for redesigning in furtherance of the objective sought to be accomplished by the contracts. There is no evidence which would support the conclusion that the devices were placed with defendants as a voluntary bailment, for safekeeping, entirely separate and apart from any purpose to be accomplished by the contract or from the existence of the contract. Up to the time of plaintiffs' demand for return of the polyscopes, defendants, as parties to the joint enter-

prise, had as much right to possession as did plaintiffs. Plaintiffs, in their demand made no offer to return the $5,000, and therefore the demand was ineffective to alter the situation. There is no showing that the defendants did not stand ready to return the machines upon repayment to them of the money advanced under the contract.

Under these facts, as established by the evidence, plaintiffs are not entitled to relief on their first cause of action. There is no showing of a right in plaintiffs to possession of the property except upon the return by them to defendants of the $5,000. Neither is there proof of any wrongful withholding by defendants. Moreover, it is obvious that plaintiffs could not recover on the first cause of action on the theory that the contract was eliminated and at the same time recover on the second cause of action on the theory that the contractual relation still existed for the purpose of securing damages, or restitution.

There is no merit in defendants' contention that McMahon can recover only as trustee, and he has failed to sue in that capacity. Although McMahon testified that he was both a trustor and the owner of the property as trustee under the trust created by the contract, the pleadings show that he appears as plaintiff herein in his individual capacity. The suit is simply one between the original parties to the contract to recover for an alleged breach, and the contract is terminated for all purposes except for such recovery.

It is obvious from what we have said in the foregoing opinion that the judgment must be reversed and the cause remanded for further proceedings in the trial court. In view of the rules of law which we have announced as applicable to the facts of this case the parties may desire to amend their pleadings in order to seek the relief which may be accorded pursuant thereto and they should be permitted to do so.

The judgment is reversed.

Shenk, J., Traynor, J., and Schauer, J., concurred.

Respondents' petition for a rehearing was denied July 22, 1947.