---

The De Mille Company, Plaintiff, *v.* Pat J. Casey and Others, Defendants.

Supreme Court, New York Special Term, June, 1923.

**Contracts — when breach of one covenant gives right to rescission — motion picture rights — equity — cancellation of contract.**

When the breach of one of the covenants of a contract goes to the whole consideration thereof, the injured party has the right to rescind the contract and whether the other party cannot or will not perform is of no consequence.

The principal defendant having been granted a license to make motion picture versions of a number of plays owned or controlled by plaintiff, assigned his rights to a corporation, a defendant herein, which had been formed for the purpose of making said motion picture productions. Thereafter said corporation caused all but one of the plays to be produced by another corporation, a defendant herein, and for a time the plays were distributed through the agency of one W. and subsequently through the agency of a distributing organization. Under the license agreement which provided for its continuance for eight years from its date and for such time thereafter as the royalties therein specified were paid, the licensee was required to make certain payments to plaintiff based upon each week of actual exhibition of the pictures so produced. The licensee having made default in payment, the plaintiff rescinded the contract and so notified him and the other defendants in writing, but in spite of such rescission the defendants continued to distribute and exhibit the plays. Upon the trial of an action for the rescission of the contract which provided that upon the termination of the license period the motion picture rights would revert to plaintiff, and to enjoin the further exhibition or other exploitation of said plays and for an accounting and damages, the evidence disclosed that prior to the written notice of rescission all the pictures manufactured had been shipped abroad and exploited on behalf of the defendants. It also appeared that there was no basis on which the exact amount of compensation could be made or for the determination of the number of weeks each picture was exhibited or of the profits derived therefrom. *Held*, that plaintiff was without an adequate remedy at law, and the, defendants having refused to consider the notice of the rescission of the contract or to modify or cease their objectionable and unwarranted activities in the continuance of the fraud upon plaintiff, a court of equity had jurisdiction to decree the annulment of the contract.

A claim that a rescission required that the parties be placed in *statu quo* and that restitution of the sums paid to plaintiff had neither been made nor tendered, was not pertinent to the case.

A decree rescinding the original contract as of the date of the notice of rescission given by plaintiff and declaring the contract canceled, etc., as prayed for, granted.

Action to rescind contract.

*Ernst, Fox & Cane* (*Nathan Burkan* and *Melville H. Cane*, of counsel), for plaintiff.

*Price & Nathan* (*Leon Price*, of counsel), for defendant Pat J. Casey.

*Walter M. Kingsley*, for defendant Biograph Company.

*Mortimer Fishel* (*Louis Salant*, of counsel), for defendant Protective Amusement Company.

WAGNER, J.  The action was for rescission of a contract licensing the defendant Pat J. Casey to make motion picture versions of thirteen plays owned or controlled by the plaintiff.  After the obtainment of these motion picture rights to the plays, in 1913, Casey assigned the same to a corporation formed for the purpose of making the motion picture productions of the plays, which corporation was named " Protective Amusement Company " and which corporation was one of the defendants herein.  Thereafter the Protective Amusement Company caused these plays, with the exception of one play, " The Royal Mounted," to be produced by the Biograph Company, a defendant herein, and the plays were thereafter distributed through the agency of one Waters for a time, and subsequently through the agency of the General Film Company, a distributing organization.

Under the license agreement between plaintiff and Casey the latter was required to make certain payments to plaintiff, based upon each week of actual exhibition of the pictures so produced. After his default in these payments and in November, 1916, the plaintiff rescinded its contract and so notified Casey and the other defendants.  In spite of such rescission the defendants continued to distribute and exhibit the plays, and this action was brought to rescind the license agreement to Casey and to enjoin the defendants from further exhibition or other exploitation of these plays and for an accounting and damages.

After a lengthy trial Mr. Justice Hotchkiss rendered an opinion in which he found that there had been a breach by Casey of the essential conditions of the contract, and wherein he held that the said contract should be rescinded.  It was found that Casey was bound to account to the plaintiff for all moneys received as a result of any exhibition or exploitation of the plays, from the time when his early payments ceased down to the entry of the decree. On the theory that, independent of statutory proceedings based on infractions of the Federal Copyright Law, in the instant proceeding the plaintiff's rights were determinable solely by resort to the provisions of the contract and such rights as were afforded by the common law; that since the contract licensing the exhibi-

,tions ran to Casey and his assignee whereas the covenant to pay was an individual one of Casey's, irrespective of wheresoever and by whomsoever the film exhibitions might be had, there can be no question of Casey's liability to account up to the time of the plaintiff's rescission of the contract. Further, that while the contract was in force, he could, on plain principles of equity, make no claim against the title of the plaintiff, and equally is constrained since its rescission from seeking to oppose the payment of any moneys due plaintiff in accordance with the decree finally entered. Equity's discouragement of circuitous or unnecessary litigation coupled with its practice in securing to parties full relief when in its portals, undoubtedly renders Casey's liability to account as continuous up to the entry of the final decree. As the learned justice said, *Hyatt* v. *Ingalls*, 124 N. Y. 93, and other cases of similar import do not oppose such a finding, in that the state's jurisdiction is limited to actions brought for violations of rights other than under the copyright or patent laws solely cognizable by the federal jurisdiction. It was held that the other defendants, namely, the Protective Amusement Company and the Biograph Company, were not subject, under the facts, to any duty to account to plaintiff for moneys received pursuant to their exhibitions; their rights to exhibitions were subject to and could be no greater than the rights provided for in the original contract before assignment. In the absence of assumption of its covenants on their part, and the case is conclusive in that respect, they were under no obligation to perform the covenants which Casey had originally engaged himself to perform. *Case* v. *Case*, 203 N. Y. 263. Inquiring into their obligation, if any, to account and separating the examination into the two periods as above outlined, that is, during the time prior to rescission and that following up to the time of decree, with respect to the first they were simply carrying out their contract and were rightful users of the plays in accordance with the license which Casey had and, by the terms of the contract with the plaintiff, was entitled to assign to them. As to the latter, since common-law rights alone could be availed of, and on the theory that the plaintiff's copyright of the stage plays worked an effacement of such common-law rights and in turn also a loss of the screen rights thereto, the federal court had sole jurisdiction, and no rights to accounting, therefore, could be adjudicated in this action. This was, in substance, the total of the rights afforded by the court to the plaintiff at the conclusion of the trial, and intended to direct the findings and orders of the court in the final decree to be entered. Thereafter the plaintiff brought on a motion returnable before the trial justice who had heard and decided the action, for an order

reopening the trial, allowing the plaintiff to offer additional proof with respect to copyrights of the thirteen plays which constituted the subject-matter of the suit, and for the correction of the testimony adduced with respect to said copyrights, on the ground that the examination of witnesses by defendants' counsel as to the copyrights to the plays had caused the trial court to be misled on that subject. It appeared that this examination brought out testimony that some of the plays had been copyrighted prior to the plaintiff's agreement with Casey by certain specified individuals named upon the trial, and a statement of defendants' counsel appeared in the form of a stipulation (though there is no agreement of plaintiff's counsel consenting to such) to the effect that each and every one of the thirteen plays referred to in the complaint were duly copyrighted prior to the date of the original contract and that such copyrights were still in force and effect. Plaintiff's counsel had obtained from the register of copyrights at Washington, D. C., information that six of the plays, namely, " Beverly of Graustark; " " Lord Chumley; " " Rejuvenation of Aunt Mary; " " Road to Yesterday; " " Stampede," and " Men and Women," had at no time been copyrighted and that there was still a reservation to plaintiff of its common-law rights therein. There was further evidence on the trial that the motion picture versions of the twelve plays were copyrighted by Klaw & Erlanger as owners and the Protective Amusement Company, defendant, as author, at the instance of the latter, and the plaintiff on its motion sought to reopen the case for the purpose of producing the additional evidence with respect to them; that as to the motion picture " Beverly of Graustark " there was a subsequent copyright of the same taken out by the defendant Biograph Company in 1916; likewise, as to the " Rejuvenation of Aunt Mary," the same defendant copyrighted it in that year; and that as to the motion picture " Stampede," the same defendant took out an original copyright thereof in 1916, and relief appropriate, based on the above evidence, was sought in the prayer for relief in the motion papers. This motion was granted, the trial reopened, and the court proceeded to take proof that those of the plays above referred to were never copyrighted and proof of the dates on which the defendant Biograph Company obtained copyrights to certain of the pictures subsequently. This evidence was taken subject to the objection and exception of the defendants, and preliminarily received by the court stating its intention to examine the force and effect of it with a view to determining what, if any, finding should be made with respect thereto.

6

Supreme Court, June, 1923.      [Vol. 121

The evidence disclosed that, prior to the written notice of rescission, all the pictures manufactured were shipped abroad and exploited by Nichols on behalf of the defendants. The Biograph Company received large sums for these rights, and in February, 1915, delivered to the Protective Amusement Company a statement, reporting the proceeds of these foreign rights; others were exhibited up to the date of the notice of termination and long afterwards, until 1919. From October, 1914, no statements were made to plaintiffs by Casey, nor payments made. In fact the arrangements for exhibition had become so complicated that there were practically no reports made after said date. The defendants' excuses therefor were not convincing in the absence of any acts of plaintiff causing or consenting to such conduct, and can be of no avail. The question really presented is whether the breach was such as permitted legal rescission, as evidenced by the written notice, or whether such notice was without legal import. The contract provided that it should continue for eight years from date, " and thereafter " for such time as the royalties specified were paid. Casey had the right to assign, which he did. He, therefore, with full obligation to account and pay, voluntarily placed himself where he was, dependent on the good faith of others to enable him to carry out his contractual liabilities. The first exhibition was in May, 1914. After October 5, 1914, no royalties were paid the plaintiff. There was, therefore, after six months from the inception of a contract intended to continue for at least eight years, a default of what I consider the primary and essential stipulation running in plaintiff's favor, with a likelihood that such default would continue. Did, therefore, the plaintiff have a right to declare a rescission when it thereafter sought to terminate the contract by written notice? The question seems controlled by the principle that a breach of one of the covenants that goes to the whole consideration of the contract, gives to the injured party the right to rescind the contract, or, as might be conversely stated, a breach which does not go to the whole consideration or is merely subordinate or incidental to its main purpose, will not constitute such a breach as to entitle the injured party to rescind. Every breach does not operate as a discharge; it must go to the roots and vitals, as, for instance, repudiation, impossibility of performance by the other party's act or failure to perform the essential conditions. It is only then that discharge and exoneration may take place. Termination is permissible where it is " so substantial and fundamental as to strongly tend to defeat the object of the parties in making the contract " (*Callanan* v. *K., A. C. & L. C. R. R. Co.*, 199 N. Y. 268), and whether the other party " cannot or will not " perform,

as Professor Williston says in " Repudiation of Contracts " (14 Harv. Law Rev. 317), is of no consequence.

·*Raftery* v. *World Film Corporation*, 180 App. Div. 470, is strikingly analogous. In that case there had been turned over to the defendants for production purposes a negative and twenty-six prints of a picture. The contract obligated certain payments to be made weekly with statements showing receipts, with privilege to plaintiff of inspection of defendants' books monthly. The defendants defrauded plaintiff by not paying the proper percentage of the receipts, by maintaining fictitious and fraudulent books, and by preventing opportunity of inspection; there was, likewise, a retention of possession of the prints by defendants. There the court said in upholding the right to rescission: " The consideration of the contract was the payment of fifty per cent of the gross proceeds after certain deductions. Inasmuch as the defendant was giving the production, through its different agencies, the amount of those proceeds were known only to the defendant. It was, therefore, deemed necessary to stipulate that the defendant should make weekly reports of the gross receipts, and should allow plaintiff access to its books that their accuracy might be tested. The giving of false and untrue reports of the proceeds and the refusal of the defendant to allow the plaintiff access to its books as stipulated, were clearly ' material and willful ' breaches and ' repudiation of the contract or an essential part thereof,' and also such breaches ' as substantially defeats its purpose.' It would seem from this authority that the breach must be fundamental if it be not willful, but if willful, then a breach in any material stipulation constitutes ground for rescission. That the breach must be of a material provision is undoubted, but that false reports upon which payments are made under the contract and a refusal to allow a verification of those reports constitute a breach of a material stipulation in the contract is too plain for controversy. (See, also, *Norrington* v. *Wright*, 115 U. S. 188, 204, 205; *Kokomo Strawboard Co.* v. *Inman*, 134 N. Y. 92.)" It seems clear that the defendant Casey ·substantially failed to perform the agreement made by him, and has placed the plaintiff in a situation entitling a rescission of the · agreement. Every contracting party has the legal right to consider himself absolved from his obligation where the other contracting party has failed to perform the substantial conditions of the agreement.

It is contended by defendants that, assuming all the foregoing to be true, under the notice of rescision the plaintiff has adequate legal remedies for its violated rights and equity should not decree a rescission remitting plaintiff to the protection of its rights in

a legal forum. This contention, doubtless, couples with it the forced admission, or at least must be based on the assumption that the court has found as a matter of fact that, ignoring the rescission and in defiance thereof, the defendants thereafter persisted in exploitation of the pictures, entered into contracts with third parties for their exhibition, and procured large sums of money therefor. Under the evidence it is clear that there is no basis on which the exact amount of compensation can be made or for the determination of the number of weeks each picture was exhibited or the profits derived therefrom. Procedural defects of the legal remedies of replevin or detinue prevent adequate relief by way of the obtainment of possession and, obviously, prevent full relief with respect to the percentage of profits. In addition, the avoidance of multiplicity of suits and inadequacy of legal remedies, in that they would not constitute the plain, practical, efficient, and speedy ones obtainable in equity (*Fredenberg* v. *Whitney*, 240 Fed. Rep. 819), gives plaintiff recourse to an equitable forum. Finally, in the most important respect of all, a court of law could not here give adequate relief, for this reason: In this case plaintiff's notice proved futile and ineffectual. The defendants refused to consider it, or modify, or cease their objectionable and unwarranted activities. Resort to a court of equity was indeed necessary to terminate the perpetration of wrong and discontinue the performance of future acts of a similar character. The agreement giving rise to defendants' repeated acts was to continue for a long period of time, and the only effective relief the plaintiff could have, where its continuance was a fraud against it, was its annulment, decreeable only by a court of equity. I, therefore, sustain the jurisdiction of this court to afford relief. Like resort to equity was countenanced in *Hat Sweat Mfg. Co.* v. *Porter*, 34 Fed. Rep. 745, where the licensees failed to pay royalties provided for by a license agreement, but continued to use the plaintiff's patents. The court said, at page 746: " The defendants assume the right to use the patented machines without compensation; a right acquired under a contract which they now repudiate. By their acts they are endangering the license system of the complainant, and unless promptly restrained, will give encouragement to other licensees to imitate their example. Actions at law for royalties as they fall due would not afford complete relief to the complainant. A new action would be necessary every month not only against the defendants, but against other licensees, who are now acting in like manner, by repudiating their contracts with the complainant, and are still using the rights acquired under them. To refuse the injunction would lead to a multiplicity of suits which may be prevented

on a final hearing of this case. The complainant is also entitled to a discovery. These are recognized heads of equity jurisdiction. Injunctions have been granted in this class of cases on a much narrower basis than is here presented." See, also, *Excelsior W. P. Co.* v. *Pacific Bridge Co.*, 185 U. S. 282, where, at page 290, the court says: " Now, it may be freely conceded that, if the *licensee* had failed to observe any one of the three conditions of the license, [the first being to pay a license fee or royalty at the times fixed in the license agreement], the *licensor* would have been obliged to resort to the state courts either to recover the royalties *or to procure a revocation of the license.*" The further claim is advanced by the defendants that a rescission requires the placing in *status quo* of the parties and that restitution of the sums paid to plaintiff has neither been made nor tendered. The contention is not pertinent to this case. Only where an attempt is made to establish that the contract in its inception was void, is there a duty of restoration to conditions existing at the time of entry; here we recognize the validity of the contract till rescinded. The duty does not arise where the termination results from breaches tantamount to repudiation.

From the foregoing, principles of equity jurisdiction, as construed by authoritative decisions, plainly entitle the plaintiff to a decree of this court declaring the plaintiff's right to terminate the contract, as was done, and making effective, by decree, such determination. There are interesting questions arising, especially in view of the introduction of the new evidence as to the plaintiff's additional rights of relief by way of accounting against the several defendants. It would seem unnecessary to dwell at length upon the patent liability of the defendant Casey to account to plaintiff for moneys received during the entire time, from the inception of the contract to the time of entry of decree. With the views of the justice who presided at the initial trial, respecting his liability, I am in entire accord. The promise on his part was a personal one notwithstanding who might exhibit or where the exhibitions under other auspices might take place. The terms of the contract are explicit, and fasten upon him that liability up to the time of the rescission. For the period following, the jurisdiction of this court is broad enough on well-known principles for the avoidance of circuity of actions, and its desire as well as practice is to afford whatever relief the nature of the case might require, including all phases up to the termination of the litigation. The necessity of turning over the gains on a basis somewhat analogous to that of a trustee who has acquired profits by wrongful use from the property of the recipient of the trust, is the logic of the claim; for which reason this court,

for the purpose of administering complete relief, will dispose of such claims rather than remit the party damaged to another forum, and, as was said in *Hamilton Shoe Co.* v. *Wolf Brothers,* 240 U. S. 251, 259, " and profits are then allowed as an equitable measure of compensation upon the theory of a trust *ex maleficio.*" In other words, the right to decree an accounting of profits and damages is incidental and subsidiary to the injunctive relief. *De Bekker* v. *Stokes,* 219 N. Y. 573, was a case involving a similar consideration. When that case was in the Appellate Division it was held that the plaintiff was entitled to a rescission of the contract, to an accounting and for such damages as resulted from the breach. Upon affirmance in the Court of Appeals, the question certified as to the disposition on the rescission was affirmed. Subsequently, in a suit brought by plaintiff in the United States District Court against the defendant on the theory of an infringement of copyrights, the complaint was dismissed (248 Fed. Rep. 838), where it was held that the plaintiff in the state court had already obtained all the relief he was entitled to because of the judgment therein allowing proof of damages and profits. In so far as the other defendants are concerned, it may be said that the evidence does not point to any assumption of a covenant or promise to pay plaintiff for any rights which it received under the contract as assignee thereof. The assignee of a contract is not liable and cannot be compelled to perform the covenant of the assignor. It is true that, when made and entered into, there may have been full knowledge of the provisions therein contained; but more than that is necessary to oblige the assignee to perform the assignor's covenants. There is no evidence here of a guaranty, no specific or substitutionary agreement, no novation nor assumption of duty. Up to the time of rescission it was exercising its lawful right as licensee in pursuance of Casey's assignment to it, and nothing which it did during such time can predicate against it a liability for accounting.

On the other hand, as to the period following the notice of rescission, it is claimed by the defendants that no relief by way of accounting can be afforded plaintiff in this action, for the reason that subsequent use of the plays in films placed the defendants in a position where, at the most, they could be charged with a violation of copyrights, necessarily denuding this court of jurisdiction. In other words, after the enforced cancellation of the contract the defendants exercised rights *dehors* the contract as if license thereto had never been issued; that their use thereafter could not be construed as one by reason of contractual right but one constituting purely an infringement of copyright, cognizable alone by federal jurisdiction. *Henderson* v. *Dougherty,* 95 App. Div. 346; *Schalkenbach*

v. *National Ventilating Co.*, 129 id. 389, 393. Such rule is unquestioned and would undoubtedly apply were the facts adaptable to its application in whole. A copyright does impliedly, and actually in result, cause a loss of common-law rights. The evidence adduced at the rehearing, however, and uncontradicted by defendants, discloses that the original claim of defendants, as shown by the purported stipulation read into the trial and emphasized by reiteration in their briefs, does not strictly accord with the actual circumstances. It, therefore, must be assumed that the evidence is clear and substantial for the purpose of the decision, by the certificate of the register of copyrights that the five plays referred to were at no time copyrighted and that plaintiff had reserved to itself the common-law rights thereto. The claim which plaintiff now makes, that it is entitled to a finding of this court that the companies defendants be required to account to the plaintiff for the profits of these uncopyrighted plays, is met by the argument that the motion picture rights therein have fallen into the public domain by reason of use thereof under the license agreement. An examination of the provisions of the agreement, however, does not sustain, in my opinion, this contention; it shows a clear intention that, upon the termination of the license period, the motion picture rights would revert to the plaintiff. The defendants had been very careful to obtain the exclusive and sole right for the motion picture exhibitions; they, likewise, meant that their rights should remain exclusive; they did not mean that their exclusive right should, in fact, as they now claim, do away with the sole rights which they designed the license agreement to afford them. Stated otherwise, their argument reduces them to the position of maintaining that the plaintiff, when it gave them an exclusive right for a certain period to exhibit, intended that the use of the license should destroy the selfsame right. As a matter of fact, however, I do not see that there ever was a publication or dedication to the plaintiff where the public as a whole could claim a right to these plays. The plaintiff's control over them, and the use which it authorized others to make of them, caused no cessation of its original rights. There was, in law, no circulation, exhibition, or distribution of the subject of the copyright that, under the authorities, would constitute an abandonment. *Daly* v. *Walrath*, 40 App. Div. 220; *Bobbs-Merrill Co.* v. *Straus*, 147 Fed. Rep. 15; *Werckmeister* v. *American Lithographic Co.*, 134 id. 321. It is enough to point out, as showing the defendants' own lack of conviction respecting this contention, that, even after the date of the notice, they attempted to copyright the motion picture rights of several of the plays. Performance of an ordinary play has never been held to be

a publication. The mere performance of a photoplay can have no different result; nor can the leasing of the latter or the furnishing of the film constitute a dedication under the circumstances here shown. Furthermore, as defendants conceded, the question of publication is largely one of intention. The court, in *American Press Assn.* v. *Daily Story Pub. Co.*, 120 Fed. Rep. 766, held that where one is licensed to publish a work he may not be the agent of the licensor with power to dedicate such work to the public and that the publication of such copyright work only has such effect where it is done with the consent of the proprietor, and is actually so intended, the licensee acquiring the privilege of publishing but no proprietary rights in the copyright. Nor does the subsequent copyrighting of the picture rights, in the several instances herein appearing, protect the defendants nor deprive the plaintiff of its right to enforce its common-law rights. *Ferris* v. *Frohman*, 223 U. S. 424.

The plaintiff is entitled to a decree rescinding the original contract as of the date of notice, declaring the same canceled, and enjoining the defendants from asserting or exercising any rights under the contract and from the further use or disposition of the negative or positive prints of the plays; to the repossession of the plays and all rights therein; to the return of the manuscripts, directing the Biograph Company to transfer to the plaintiff the copyrights upon the three pictures on which it had obtained copyrights, directing the defendants Biograph Company and Protective Amusement Company to account to plaintiff for the moneys received by them, or either of them, after February 25, 1916, from the reproduction and exploitation by motion pictures of the five uncopyrighted plays, and directing the defendant Casey to account for all dealings with the copyrighted plays from the date of the contract to February 25, 1916, and as to the uncopyrighted plays, to the time of the decree. Submit findings and decree in accordance with the above.

Judgment accordingly.