[Civ. No. 4140. Fourth Dist. Nov. 22, 1950.]

JOSHUA TREE TOWNSITE COMPANY (a Corporation), Appellant, v. JOSHUA TREE LAND COMPANY (a Corporation), Respondent.

Elizabeth Armstrong Cupp and Lester V. Peterman for Appellant.

Musick, Burrell & Ingebretsen and James E. Ludlam for Respondent.

GRIFFIN, J.—Defendant Joshua Tree Land Company, a corporation, owned several tracts of land in a desert community known as "Joshua Tree," near "Twenty-nine Palms." One of these tracts, No. 2556, had been developed by defendant and subdivided and partially provided with water furnished by defendant through its system of pipes. A few lots were sold but the development was not an entire success. In 1942, one Bunker, a real estate sales promoter, orally agreed with defendant company to sell the property for defendant under a "60-40" agreement. The sales increased, and in February, 1943, the parties entered into a written option agreement with Bunker and one Pankratz, who were in partnership, by which defendant company optioned to the partnership all lots in Tract No. 2556 and the unsubdivided acreage adjoining it and in its vicinity under an agreement whereby the partnership would have the exclusive right to purchase all unsold lots in the tract at a price of 25 per cent of the list price contained in a schedule set forth therein, and which option was to be exercised at any time *while the agreement was in force*. This term was for 10 years on condition the partnership pay to defendant company in advance certain sums of money, under certain conditions set forth. It then provided that defendant company would not, during said period, sell any of its unsubdivided acreage except by consent of the partnership.

In August, 1943, this option was assigned to the Joshua Tree Townsite Company, a corporation formed by the parties to the partnership. A considerable number of sales were made by the townsite company under unrecorded written term contracts of purchase. Defendant land company was to release the lots and execute deeds to the property when all payments were made. The selling project was a success. In May, 1945, by written agreement, the land company agreed to sell to the townsite company, under similar arrangements, another tract, No. 2811, at 50 per cent of the agreed retail prices. In the next two years, by similar agreements, defendant had agreed to sell and plaintiff had agreed to buy 11 other whole tracts and one unsubdivided parcel, all in the immediate vicinity of Tract No. 2556, containing about 1,000 acres, and sales were to be made on deferred payments.

In this same vicinity was a one-half section (No. 35) of

land, owned by a railway company. It is the property which is now in dispute in this action. Prior to 1942, defendant had contracted, under conditional sales agreement, to buy this one-half section, but later failed to make the necessary payments and it reverted to the owner. Early in 1943, Bunker urged defendant to buy this one-half section for the general development of the tracts but because of defendant's experience in its previous attempted sale of lots, it refused. About April, 1943, Bunker, in his own behalf, contracted with the railway company, on the deferred payment plan, to purchase that one-half section for $1,600. There was some discussion between plaintiff and defendant about this one-half section being turned over to defendant company "as a part of the deal." Lot sales continued and plaintiff was very short of available lots to sell. When the parties were discussing the sale to plaintiff of Tract No. 2738, defendant made it a condition of the deal that defendant be given an option to buy the one-half section (No. 35) and a written option agreement was executed at that time, by the terms of which plaintiff was to be repaid the $1,600, but was to be paid additional compensation as follows: "Upon its acquisition . . ." defendant shall pay to plaintiff "a sum equivalent to twenty-five dollars ($25) for each acre of said real property contained in any subdivision or subdivisions. The amounts payable" shall be "paid in cash . . . at the time of each subdivision of any portion of the real property covered by the aforementioned contract." It then provided that as a part of the consideration for the execution of the agreement concurrently executed with it covering purchase and sales of lots in Tract No. 2738 and as a part of the same transaction, plaintiff grants to the defendant the option to purchase the one-half section.

Plaintiff's option to purchase Tract No. 2738, executed the same day (May 28, 1945) made no mention of the option agreement pertaining to the one-half section (No. 35). It provided for the sale of Tract No. 2738 to plaintiff under the general conditions heretofore mentioned and that if plaintiff defaulted in payments or failed to comply with its terms the whole amount became due and payable and, at the option of defendant, and upon written declaration of default, plaintiff forfeited all rights under the agreement and all its interest in the realty to the defendant, and that all properties involved became defendant's sole property as consideration for the execution of the agreement and as liquidated damages.

Operations under the respective contracts continued with-

out particular complaint until March, 1946. Plaintiff had charge of grading streets, paving, and installation of water lines, and billed the defendant company for those charges as the work progressed. Water pipes were not installed in certain tracts, apparently due to unavailability of material, and general improvements lagged. Cancellations and refunds demanded by contracting purchasers were numerous. Plaintiff did not keep up its payments on its options to purchase from defendant and it was admittedly in default thereon in considerable sums. Due to lack of funds payable by plaintiff to defendant, the inability to purchase additional pipe and equipment for water-pipe installations, and other unexplained causes, sales dropped to near zero.

The one-half section (No. 35) was never subdivided for sale. About June 23, 1948, defendant served plaintiff with written notice of intention to forfeit all unperformed contracts unless the defaults in payment were cured prior to July 1, 1948. On July 1, 1948, plaintiff filed this action for declaratory relief and asked the court to determine how much plaintiff was in default and to declare the rights of the parties. Thereafter, defendant declared certain other contracts forfeited for the alleged defaults.

By amended complaint, in October, plaintiff set forth more in detail all the transactions and asked that the court declare the rights of the parties, particularly as to whether plaintiff was entitled to the return of the one-half section (No. 35). On January 26, 1949, plaintiff served defendant with notice of rescission of *all* of the contracts and filed its supplemental complaint accordingly. The defendant answered and alleged that plaintiff was in default on certain option contracts in the sum of $61,361. It then alleged that water was available to said tracts; that any delay in the installation of the pipes was due to the unavailability of a water pump and that plaintiff had full knowledge of this fact. Defendant then charged that plaintiff had opened another near-by subdivision, in competition with this subdivision and that some of the bills sent to defendant for payment involved work being performed on plaintiff's own tract. Defendant then prayed for judgment that the respective rights of the parties be determined and that it be declared that plaintiff had no right to the east one-half of Section 35 and that it forfeited its right to any payment on the subdivision thereof.

Plaintiff's theory of the case is that all contracts were factually tied into one by defendant; that defendant had no right

to forfeit any of the contracts because plaintiff was not in default because its default of payment was due to the failure of defendant to perform its part of certain option contracts dated March 8, 1946, and May 27, 1947, in that it failed to install water and pave roads, which fact entitled plaintiff to rescind as to all contracts; that the option contract of May 28, 1945, *re* the east one-half of Section 35, was obtained through duress and that there was a failure of consideration.

During the trial the parties stipulated that it was their desire to protect the rights of the contract purchasers and to settle their differences excepting as to their respective claims to the east one-half of Section 35. Plaintiff, among other things, agreed to make assignments of its rights to a trustee and defendant agreed to execute deeds to the contract purchasers when money was available and when payments were made in full. It was then agreed therein that the respective rights of the parties to the east one-half of Section No. 35, be submitted to the court for determination, and in that connection the court should consider the evidence submitted on the entire questions presented on all exhibits in evidence and on the pleadings; that the court should not consider the effect of the stipulation upon any of the contracts, agreements or acts of the parties, but should consider the agreements, conduct and acts as though the stipulation had not been executed. Judgment was then entered on the issues disposed of by the stipulation, and the remaining issue was submitted for decision.

The trial court found, as to the east one-half of Section 35, that defendant fully complied with the terms of the option agreement of May 28, 1945; that there was no failure of consideration under its terms; that there had been no subdivision of said one-half section; that Bunker and the president of the defendant land company orally agreed that the east one-half of Section 35 should be purchased from the railway company "for the benefit" of defendant land company; that it was true that defendant refused to enter into the contract of May 28, 1945, for the sale of 86 lots in Tract No. 2738, unless plaintiff gave defendant the option to purchase the east one-half of Section No. 35, and that it was true that the two contracts were executed simultaneously; that it was true that defendant paid plaintiff all the consideration provided in the option agreement regarding the east one-half of Section 35, and that said transaction was closed except that in the event of a "subdivision" of that property the agreement provided that

plaintiff was to receive a bonus of $25 per acre; and that it is not true that defendant land company agreed to subdivide it and resell it to plaintiff. The court then concluded that plaintiff was not entitled to a rescission of the agreement covering the east one-half of Section 35; that plaintiff's action for such a rescission was barred by laches and declared that plaintiff had no interest in that one-half section and that all rights of plaintiff to $25 per acre upon its subdivision had terminated. Judgment was entered accordingly. Plaintiff appealed and challenges the sufficiency of the evidence to support the findings and judgment.

Considerable evidence was received as to payments that were made by plaintiff to defendant and of work ordered done, which was supervised by plaintiff and which was charged to defendant. There was evidence that plaintiff claimed credit for money it advanced in such construction work on behalf of the land company. A detailed statement of that account would not only be difficult to ascertain from the great mass of evidence on the subject, but it would leave considerable doubt in the mind of any judge as to how those credits were applied and whether any of the option contracts had been paid in full. Suffice to say, the evidence shows that such money as was paid over to defendant land company by plaintiff was put right back into the cost of preparation of a new subdivision. The report of plaintiff's own certified public accountant shows that from an examination of the books of both parties, there was, on December 15, 1948, around 40 or 50 thousand dollars in delinquencies pertaining to the option contracts. There is no evidence that any amount was subsequently paid on that delinquency. The only defense plaintiff has to such a finding is that the delinquencies were caused by defendant's failure to perform its part of the agreements in reference to the installation of water pipes and improvements required to be installed by defendant. There was considerable evidence produced that such failure was not due to the fault of the defendant. A water company was formed which did take over the installation of pipes and the furnishing of water to the several tracts. Plaintiff knew of this fact. Plaintiff had charge of putting in all the improvements required. Apparently defendant company merely approved the plans and paid the bills. The entire work was supervised by plaintiff. For a further water service than that which already existed for the first tract developed, it was necessary to have a booster pump to convey the water to the new tracts. The main delay

was due to the inability of the water company to obtain such a pump. It was finally obtained and installed. It cannot be said that defendant was solely responsible for this condition. From the evidence it would appear that plaintiff was continually in default under its optional agreements. That *continual* default was not due to defendant's conduct. Even if it were shown that both parties were, to some extent, in default in the performance of their respective agreements, a court of equity would not order a rescission of the one agreement here in question and return the property to plaintiff without requiring plaintiff to return everything of value it received under the contemporaneous agreements between the parties and which bore upon that transaction. The trial court might well have believed, under the evidence and the stipulation agreed upon, that plaintiff still owed defendant in excess of $50,000 when plaintiff brought this action for rescission, and that by the time defendant land company would be called upon to issue deeds to the various property owners who purchased the lots under their contracts of sale, there might not be sufficient funds in the hands of the trustee to pay defendant.

A party to a contract who has defaulted cannot seek rescission. (*Fairchild-Gilmore-Wilton Co.* v. *Southern Refining Co.,* 158 Cal. 264 [110 P. 951] ; *North American Dredging Co.* v. *Outer Harbor Dock & Wharf Co.,* 178 Cal. 406 [173 P. 756].) Rescission is not allowable where the party demanding it cannot or does not restore the other party to the condition he would have been in but for the contract. (*Jones* v. *Bay Cities Electric Co.,* 22 Cal.App. 81 [133 P. 492] ; *Alder* v. *Drudis,* 30 Cal.2d 372 [182 P.2d 195].) Even if the court were to grant a rescission in this case as to the sale of the east one-half of Section 35, there would be no plausible way to adjust the equities between the parties concerning the contemporaneous agreements since the bulk of those properties have been conveyed beyond recall, i. e., it would be impossible to return the parties to anything approximating a *status quo.* (*Appliance Co.* v. *Kelley,* 102 Cal.App. 67 [282 P. 518] ; *Peterson* v. *Wagner,* 52 Cal.App. 1 [198 P. 25].)

The option agreement which plaintiff is seeking to rescind was executed about May 8, 1945. Its notice of rescission was dated January 24, 1949. A party seeking to rescind must act with due diligence. (Civ. Code, § 1691, subd. 1; *Wilbur* v. *Griffins,* 56 Cal.App. 668 [206 P. 112].)

In June, 1948, plaintiff discontinued all performance under all agreements. During this period defendant was

prevented from doing anything with its property by reason of the filing of this suit. The court concluded that plaintiff was not entitled to a rescission. A rescission will not be enforced that would be inequitable. (*Papenfus* v. *Webb Products Co., Inc.*, 24 Cal.App.2d 559 [75 P.2d 631].) The equities of this case were for the determination of the trial court. The evidence is sufficient to support the findings and judgment. No abuse of discretion appears.

Judgment affirmed.

Barnard, P. J., and Mussell, J., concurred.

A petition for a rehearing was denied December 19, 1950, and appellant's petition for a hearing by the Supreme Court was denied January 18, 1951.