Filed 10/24/24 Westlake Farms v. County Sanitation District etc. CA2/6

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION SIX

| | |
|---|---|
| WESTLAKE FARMS, INC., et al., <br><br> Plaintiffs, Respondents, and Cross-Appellants, <br><br> v. <br><br> COUNTY SANITATION DISTRICT NO. 2 OF LOS ANGELES COUNTY, <br><br> Defendant, Appellant and Cross-Respondent. | 2d Civil No. B322095 <br> (Super. Ct. Nos. 16CV-0244, 16CV-0283) <br> (San Luis Obispo County) |

Appellant and cross-respondent County Sanitation District No. 2 of Los Angeles County (District) bought over 14,500 acres of land—the area of Manhattan—from respondents and cross-appellants Westlake Farms, Inc. (Westlake) in 2001. They signed a leaseback agreement allowing Westlake to continue farming the land while the District built an onsite facility to compost sterilized "biosolids" extracted from treated wastewater. When

finished, the facility would provide Westlake with compost to use on the leased land. The parties considered the deal a win-win. The District secured a long-term disposal option for its biosolids; cash-strapped Westlake received a capital infusion and free compost for its multi-generational cotton farming operation.

The District spent 15 years designing and constructing the facility. It began operating in 2016 but produced much less compost than Westlake expected. Litigation followed. Westlake alleged the District downsized the facility and delayed construction when it learned how costly it would be to operate. The District alleged Westlake violated the lease by assigning its interests to a longtime opponent of the facility, selling water, and constructing a pipeline on the property.

A jury awarded Westlake $36,660,664 in lost profits. The District appeals the resulting judgment. Westlake cross-appeals the trial court's denial of recission as a remedy in the bifurcated equitable proceedings. We will affirm.

FACTUAL AND PROCEDURAL HISTORY

*The Parties*

The District processes the wastewater of five million Los Angeles County residents. A quarter century ago it faced a problem: where to send hundreds of thousands of tons of sterilized organic material, or "biosolids," left over from the treatment process each year. Kern County had recently banned farmers from applying biosolids directly to the soil as a fertilizer. Puente Hills landfill, another recipient, was nearing the end of its operational life and considering a biosolids ban in the interim.

Westlake Farms was grappling with a different problem around the same time in Kings County, located about 200 miles north of the District's headquarters. Several generations of Ceil Howe, Jr.'s family had built Westlake into one of California's

2

largest cotton producers. Rising costs and mounting debts now forced Howe to list a portion of his family's 60,000 acres of land for sale. There were no takers after several years on the market.

*The Tulare Lake Compost Facility*

A neighboring cotton farmer introduced Howe to the District's then-Chief Engineer, Jim Stahl, in early 2000. Stahl was in Kings County scouting agricultural properties where the District could apply its biosolids. Howe offered to sell the District land on the perimeter of the Tulare Lake basin owned by Westlake and three affiliated entities: Rancho Azul, Rancho Blanco, and Rancho Lago (the Rancho entities). He proposed Westlake leasing back the land and growing crops using biosolids as fertilizer. When Kings County also banned direct application of biosolids, Howe and the District formed a more ambitious plan: building a state of the art composting facility that could transform biosolids into a compliant soil amendment using wood chips and other agricultural waste.

*The Lease and Purchase Agreement*

The District agreed to buy over 14,500 acres of farmland from Westlake and the Rancho entities for $27,375,000. Two documents memorialized their transaction: (1) an "Agreement for Purchase and Sale of Real Property and Escrow Instructions" dated August 22, 2001 (Purchase Agreement), and (2) an "Agricultural Lease" of the same date (Lease).

The Purchase Agreement conditioned the sale on Westlake obtaining the permits needed "to construct and operate a composting facility" based on an attached "Draft Conceptual Design." The design specified a peak processing capacity of 900,000 wet tons of biosolids and green waste annually, but stated it would operate at about 600,000 tons so the District could accept locally generated biosolids and organic waste as needed.

3

The Purchase Agreement's recitals included the following: "In connection with the construction and operation of the Composting Facility and the continued agricultural use of the remainder of the Property, the Parties also wish to enter into a Leaseback Agreement pursuant to which [Westlake] will lease, operate, and farm a portion of the Property and will apply compost generated by the Composting Facility."

The Lease entitled Westlake to "conduct all agricultural operations" on the property for 30 years. Westlake agreed to grow "crops suitable for the use of compost produced by the Composting Facility." It would pay a minimum annual rent of $310,000 subject to adjustment once compost deliveries began. Westlake would also pay "all other impositions, taxes, assessments, liens, charges or expenses of any nature" on the property. Westlake could not assign or sublet its interest without the District's written consent. In return, Westlake would receive up to 80 percent of the compost produced by the District and an exclusive license to water rights "for farming activities consistent with past practices."

*Applying for a Conditional Use Permit*

The District needed a conditional use permit from the Kings County Planning Commission to begin construction. Westlake hired a consulting firm to prepare the required environmental impact report (EIR). The EIR estimated the facility would occupy about 1,000 acres, with the remaining land dedicated to farming crops with the compost it generated. The District's stated goal for the first year of operation was reaching an annual processing capacity of 300,000 wet tons of biosolids and green waste. This would produce about 107,000 tons of finished compost. Its goal for the second year was reaching 590,000 wet tons, producing about 210,000 tons of compost. The

4

EIR evaluated the impacts of processing 900,000 wet tons but stated the facility "may not actually achieve [its] maximum capacity . . . by the end of the first 24-month period."  It explained the District's wastewater plants produced enough biosolids to operate at maximum capacity but the amount of materials processed would depend on "a number of factors . . . including markets for finished compost, and availability of the bulking agents."

Howe and Stahl appeared before the Planning Commission in February of 2004.  Howe spoke about his family's history of farming in the Tulare Lake Basin and how the parties conceived the idea of a composting facility as a cleaner alternative to applying biosolids directly to the land.  He emphasized the project would create more than 100 well-paying jobs in an area plagued by high unemployment.

Stahl spoke to the Commission after Howe.  He said "[i]t would take [the District] approximately, once you would grant the [conditional use permit], a year for design, a year for construction, and I dare say optimistically a year for phase-up or phase-in of the start-up, ramp-up of the operation."  Stahl referred to the EIR as "our best[,] most candid effort to project to you what we think things are going to look like."

*The Parties Amend the Lease and Purchase Agreement*

Westlake needed money to pay creditors while it waited for the conditional use permit.  The District agreed to amend the Lease and Purchase Agreement by dividing the purchase into two parts.  It paid $5 million for 4,000 acres in June of 2004.  It paid the balance in June of 2006 after Westlake obtained the conditional use permit.  The parties agreed the District would

5

thereafter take over responsibility for obtaining the other permits needed to operate the facility.[1]

*Construction Begins*

The District designed the facility in-house.  Planning and research began in 2004.  It constructed a 2.5 mile driveway linking the building site to the nearest public road in late 2005.  District engineers identified geotechnical and soil drainage issues as among the biggest design challenges.  The District eventually settled on a five-phase plan that increased operating capacity from 100,000 tons (phase 1) to 500,000 tons (phase 5).  It finished the design of phase 1 in mid-2010 and broke ground later that year.

*Westlake Enters into a Side Agreement With Sandridge*

Three years passed.  Howe told the District in 2013 that he needed compost and was "extremely disappointed" about the "continual and ongoing delays of startup."  He requested they restructure the Lease and Purchase Agreement to ease the financial stress of the ongoing drought.  The District responded that Westlake needed to pay overdue rent before the District would consider doing so.  This prompted Westlake to sell Sandridge Partners, L.P. (Sandridge), among other things, an 80 percent interest in the Lease and 26,000 acres of unrelated farmland for $68 million in 2014.  The managing partner of Sandridge, John Vidovich, had originally opposed the facility's

---

[1] The "First Amendment to the Amended and Restated Agreement for Purchase and Sale of Real Property and Joint Escrow Instructions" authorized the District to withhold $2 million from Westlake until permits were issued from the San Joaquin Valley Air Pollution Control District, the Central Valley Regional Water Quality Control Board, and the California Integrated Waste Management Board.

construction because it was "incompatible" with the crops he grew on property south of Westlake's.

Westlake and Sandridge kept their deal confidential. They prepared an agreement showing Sandridge held only a 49 percent interest in the Lease so they could "eliminate the [District] from having any participation in the transfer." They then signed a "Memorandum of Understanding and Master Agreement" acknowledging Sandridge would in reality receive an 80 percent interest. Soon after, they laid an underground pipeline across District land to supply Sandridge's nearby pistachio groves with water.

*Westlake Files a Government Claim*

Westlake offered to buy back the land around the facility in the fall of 2015. It sent a letter of intent offering $20,250,000, or $1,500 per acre, "less an agreed-upon allowance for damages suffered by [Westlake] in connection with [the District's] failure to timely produce and deliver compost . . . including, but not limited [to], damages for property rent, taxes and assessments, water costs, and fertilizer and spreading costs." (Italics omitted.) The District declined the offer and denied any obligation to produce or deliver compost by a certain date. It demanded Westlake pay outstanding late charges on rent.

Westlake filed a government claim against the District in November of 2015. The claim described the District's failure to deliver compost as a material failure of consideration that warranted rescission of the Lease and the Purchase Agreement. Westlake claimed unspecified "lost expected profits." A few weeks later the District told Westlake it planned to deliver only 16,000 tons of compost per year when the facility began operating—about 8 percent of the amount contemplated when the

7

parties signed the Lease and Purchase Agreement 15 years earlier.

*Construction Ends, Litigation Begins*

Construction of phase 1 finished in December of 2015. The facility began processing biosolids and green waste in January of 2016. A dispute arose over Westlake's obligation to provide information to regulators about its farming activities on the leased property. The District accused Westlake of willfully breaching the Lease and set a deadline of May 16, 2016 to provide the information. It sent a notice terminating the lease when Westlake did not respond.

Westlake sued for breach of contract, injunctive relief, and rescission of the Lease and Purchase Agreement. Howe sued for rescission on behalf of the since-dissolved Rancho entities. The District cross-complained for breach of the Lease, breach of a joint use agreement relating to water rights on leased land, and declaratory relief. Westlake became a nominal plaintiff when it assigned Sandridge "all of [its] right, title and interests" in the Lease and District-owned land in 2017.

*Trial*

The trial court granted the District's motion for summary adjudication on Westlake's claims for rescission[2], fraud, and specific performance. A jury trial began on the remaining claims and cross-claims in August of 2021. Westlake contended the District purposefully delayed construction of the facility when it became apparent its operating costs would far exceed other disposal options for biosolids. It sought $43.6 million in lost

---

[2] The court granted summary adjudication for Westlake's claim for rescission based upon mistake of fact and fraud, but not failure of consideration.

8

profits caused by the District failing to deliver 107,000 wet tons of compost in 2011 and 200,000 tons per year through 2020. In the alternative, it sought unjust enrichment of nearly $150 million as the amount saved by the District by delaying operations and terminating the Lease.

The District denied that it delayed the project for financial reasons. Its engineers described the protracted design and construction process as normal "for a large[,] complex[,] state-of-the-art facility in a very difficult regulatory arena." The facility's location in a former lake bed proved especially challenging because the soil's high clay content caused it to settle unevenly when loaded. This required driving thousands of 50-foot canvas wicks into the ground and pre-loading the site with large piles of soil for six months before construction began. The District also denied the Lease and Purchase Agreement required it to provide compost. It introduced mostly undisputed evidence that Westlake sold leasehold water to third parties, secretly assigned the Lease to Sandridge, and built the pipeline on District land without permission.

*Jury Verdict and Statement of Decision*

The jury awarded Westlake damages of $36,660,664. It rejected the District's breach of contract claims, finding the District did not "do all, or substantially all, of the significant things that the [Lease] required it to do." It found the failure to deliver adequate compost was a material failure of consideration with respect to both the Lease and Purchase Agreement. In an advisory verdict, the jury awarded Westlake unjust enrichment of $88,803,000.

A bench trial on Westlake's equitable claims followed. The court declined to adopt the jury's advisory unjust enrichment verdict. It also declined to rescind the Lease and Purchase

9

Agreement. The court entered judgment on the damages award and denied the District's motion for judgment notwithstanding the verdict.

## DISCUSSION

### *Westlake's Damages Award*

The District contends the jury's $36,660,664 verdict is not supported by substantial evidence because no reasonable interpretation of the Lease and Purchase Agreement required the District to deliver compost to Westlake. "The trial court's ruling on the threshold determination of "ambiguity" (i.e., whether the proffered evidence is relevant to prove a meaning to which the language is reasonably susceptible) is a question of law, not of fact. (*Winet v. Price* (1992) 4 Cal.App.4th 1159, 1165.) "[T]he threshold determination of ambiguity is subject to independent review." (*Ibid.*)

The interpretation assumed by the jury's damages award finds ample support in the Lease and Purchase Agreement. The production and use of compost figures prominently in both documents. The Purchase Agreement's sixth and final recital states: "[T]he parties also wish to enter into a Leaseback Agreement pursuant to which [Westlake] will lease, operate, and farm a portion of the Property *and apply compost generated by the Composting Facility*." (Italics added.) It defines the "Composting Facility" as one "authorized to use windrow and/or aerated static pile technology, with an input capacity of approximately nine hundred thousand tons per year of biosolids, green waste, and other feedstocks." The Purchase Agreement conditioned the deal on Westlake signing and delivering the Lease to escrow at closing. The parties signed the two documents on the same day.

10

The District highlights a provision in the First Amendment to the Lease stating that "[a]t no time can [the District] guarantee the quantity of compost production in any particular period in any given year." One must read this in context with the provisions before and after. The provision before states: "It is the parties' intent for [the District] to produce and distribute and for Westlake to receive and utilize compost in a method and style that is *reasonable to all parties concerned*, and they agree, in good faith, to cooperate with each other and use their *reasonably best efforts* to address and accommodate any changes in circumstances concerning the production, storage, receipt, stock-piling, sale, distribution and/or use of compost for agricultural use . . . ." (Italics added.) The provision following it states: "[A]fter the calendar year in which the Delivery Start Date occurs . . . [the District] shall provide, for use by Westlake, all compost produced by [the District] which can be reasonably used" except a 20 percent allowance for the District's own use. We read these provisions as creating mutual obligations: The District would produce and deliver compost to Westlake; Westlake would receive and use the compost on leased land; and they would work in good faith to overcome the venture's challenges.

Having determined the Purchase Agreement and Lease are "susceptible," at least, to the interpretation assumed by the verdict, we next decide whether the extrinsic evidence supports it. Where "[t]he proper interpretation of the parties' written agreement turns not only on the language of the agreement but on the proper resolution of conflicting extrinsic evidence and upon an evaluation of witness credibility," "we are bound by the trial court's construction of the agreement if it is reasonably susceptible to that interpretation." (*Glendale Fed. Sav. & Loan Assn. v. Marina View Heights Dev. Co.* (1977) 66 Cal.App.3d 101,

11

134.)  We "view the evidence in the light most favorable to the prevailing party, giving it the benefit of every reasonable inference and resolving all conflicts in its favor."  (*Jessup Farms v. Baldwin* (1983) 33 Cal.3d 639, 660.)  We will not disturb an award of damages supported by substantial evidence.  (*Bermudez v. Ciolek* (2015) 237 Cal.App.4th 1311, 1324.)

Jurors heard testimony that the number of acres Westlake sold to the District (about 14,500) "was derivative of what the District estimated was going to be producing as to actual tonnage of compost."  They attached the EIR's "Conceptual Design" to the Lease when they amended it in 2004.  This document stated the facility would process about 600,000 wet tons of combined biosolids and bulking agents annually, with an "estimated production of compost end product" of about 200,000 wet tons. The jury heard two months of testimony and received 150 exhibits related to the facility's design and construction.  The language of these instruments and the great quantity of conflicting evidence left the jury with considerable latitude.  This record supported a damages figure based on the assumption that the District should have delivered 107,000 wet tons of compost to Westlake in 2011 and 200,000 tons annually thereafter.

*Westlake's Alleged Breaches of Contract*

The District contends Westlake's own breaches "cut off" any right to seek contractual damages and allowed the District to terminate the Lease unilaterally.  (See *Martin v. U-Haul Co. of Fresno* (1988) 204 Cal.App.3d 396, 409 [termination clause in contract limits recoverable damages to those reasonably anticipated based on exercise of the clause].)  It argues these breaches were independent of any alleged failure to provide compost.  The District invites us to review these issues de novo based on the "'clear and explicit'" language of the Lease and the

12

undisputed evidence at trial.  (See *Colaco v. Cavotec SA* (2018) 25 Cal.App.5th 1172, 1183 ["Where . . . the parties present no extrinsic evidence on the meaning of their contract, we independently interpret the contract to determine whether its covenants are independent or dependent"].)

We would not describe the relevant Lease provisions as clear and explicit.  Jurors heard conflicting extrinsic evidence about the parties' intent and received instructions on contract interpretation, conditions precedent, material performance, and anticipatory breach.  It then made findings of fact on the meaning and materiality of the provisions at issue.  Specifically, it found: Westlake "[did] all, or substantially all, of the significant things" required by the Lease and Purchase Agreement; and the District was not "excused from performing the promise[s] required" under those same two documents.  We review these findings for substantial evidence.  (See, e.g., *Brown v. Grimes* (2011) 192 Cal.App.4th 265, 277 ["the question of whether a breach of an obligation is a material breach, so as to excuse performance by the other party, is a question of fact"].)

The District identifies three breaches of contract by Westlake:  (1) selling water to Sandridge starting in 2008, (2) assigning its interest in the Lease to Sandridge in 2014; and (3) constructing a pipeline across District land in 2015.  Westlake's witnesses described these acts as compelled by financial hardship caused by the District.  The Lease states, "[the District] and Westlake agree that the Property is being leased for several interrelated uses.  To realize the benefits of this [Lease], both [the District] and Westlake *are dependent* on the parties' creating and maintaining an integrated use of compost for agricultural purposes in the manner set forth herein."  (Italics added.)  This language is reasonably susceptible to the

13

interpretation that Westlake's performance of the Lease was dependent on the District's delivery of compost and thus excused when that did not occur. In addition, the jury heard sufficient evidence from the parties to conclude that Westlake's alleged breaches were not "significant" or "material" enough to excuse the District from this obligation. We will not disturb the verdict.

In addition, the parties introduced conflicting evidence as to whether Westlake's water sales violated the Lease's requirement that leasehold water be used only for "farming activities consistent with past practices." This included testimony from Howe describing his family's practice of selling water allocated to the leased properties beginning in the 1960s. The Lease's language is broad enough to require extrinsic evidence on the issue. Howe's testimony is substantial evidence supporting the jury's findings.

*Evidence About Westlake's Deal with Sandridge*

The District characterizes Westlake's $68 million asset sale to Sandridge as a "benefit" of the District's breach. It contends the court inflated the damages verdict by excluding the sale price from evidence. We review the ruling for abuse of discretion. (See *Pannu v. Land Rover North America, Inc.* (2011) 191 Cal.App.4th 1298, 1317 ["Trial court rulings on the admissibility of evidence, whether in limine or during trial, are generally reviewed for abuse of discretion"].)

The court excluded the sale price as irrelevant because Westlake sought damages for lost profits from farming operations and not for "diminished value of other assets Westlake ultimately had to sell . . . to avoid bankruptcy." It also found the price would unfairly prejudice the jury's damages analysis. These evidentiary calls were a proper exercise of discretion. Westlake sold a diverse portfolio of assets to Sandridge. Their agreement did not allocate

14

or itemize the price of each asset.  Inviting jurors to offset Westlake's alleged lost profits using the $68 million figure would only invite speculation about the leasehold's value in the context of this larger transaction, which also included fee simple title to 26,000 acres of unrelated farmland.  Such speculation might have been appropriate if Westlake sought damages caused by a "fire sale" of its property.  It did not.  Excluding the sale price ensured jurors would not reduce the award simply because Westlake received a large sum of money for assets that were, in large part, not related to this litigation.

The trial court did in fact admit several exhibits relating to Westlake's deal with Sandridge.  This included:  the 2014 sale agreement with the sale price redacted; the contemporaneous "side agreement" containing the terms they did not wish to include in the official transaction documents; and the email in which Howe acknowledged the sale documents reflected Sandridge's interest as 49 percent only "to eliminate the [District] from having any participation in the transfer."  In addition, the court allowed the District to examine Howe and Vidovich about the deal and how they concealed certain terms.  This provided the District with ample evidence to argue that Westlake:  (1) breached the Lease's anti-assignment provisions, and (2) never intended to actually farm the leased property.  The jury did not accept these arguments.

*Westlake's Cross-Appeal of Rescission Ruling*

Westlake cross-appeals the trial court's decision not to rescind the Lease and Purchase Agreement.  It contends the jury's finding of material failure of consideration and Westlake's election of rescission over contract damages "required the trial court to fashion a rescission remedy."  "We review the trial court's decision whether to grant relief based on rescission for abuse of

15

discretion." (*Orozco v. WPV San Jose, LLC* (2019) 36 Cal.App.5th 375, 401.) "" 'As to disputed factual issues, a reviewing court's role is simply to determine whether substantial evidence supports the trial court's findings of fact . . . . As to the trial court's conclusions of law, . . . review is de novo; a disposition that rests on an error of law constitutes an abuse of discretion.' "" (*Ibid.*, quoting *O'Gara Coach Co., LLC v. Ra* (2019) 30 Cal.App.5th 1115, 1124.) "Where the evidence conflicts or is capable of conflicting inferences, the appellate court will not substitute its deductions for those of the fact finder." (*Eidsmore v. RBB, Inc.* (1994) 25 Cal.App.4th 189, 195.)

A material failure of consideration is grounds for rescinding a contract. (Civ. Code, § 1689, subd. (b)(4).) "Rescission, however, is an equitable remedy, with certain qualifications that limit its application." (*Hailey v. California Physicians' Service* (2007) 158 Cal.App.4th 452, 468 (*Hailey*).)

The jury's finding did not require the trial court dispense with its role as chancellor in equity. "A rescission will not be enforced that would be inequitable. [Citation]. The equities of [a] case [are] for the determination of the trial court." (*Joshua Tree Townsite Co. v. Joshua Tree Land Co.* (1950) 100 Cal.App.2d 590, 597, citing *Papenfus v. Webb Products Co., Inc.* (1938) 24 Cal.App.2d 559.)

The trial court decided the equities tipped in favor of the District on Westlake's cross-claim. The District bought land and constructed the facility because it needed a long-term disposal option for its biosolids. Rescinding the Purchase Agreement would have left the facility in operation but deprived the District of facility-adjacent lands to apply the compost it produced. Further, it would give ownership of the land not to Westlake, but to Sandridge, whose principal had opposed applying biosolids-

16

derived compost in the Tulare Lake basin since the project's inception. The purpose of rescission is to restore the parties to their former position and bring substantial justice "despite the fact that 'the status quo cannot be exactly reproduced.'" (*Runyan v. Pacific Air Industries* (1970) 2 Cal.3d 304, 316, quoting *Lobdell v. Miller* (1952) 114 Cal.App.2d 328, 344.) The record supports the trial court's finding that substantial justice would not be achieved by rescission under these facts. (See *Hailey*, *supra*, 158 Cal.App.4th at p. 468 [reversing rescission of health services contract presenting "unique challenges to returning the parties to the status quo, or achieving substantial justice"].)

The trial court also denied rescission based on the doctrine of unclean hands. Westlake argues the doctrine of unclean hands is "*legally irrelevant*" to its equitable right of rescission but cites no authority for this proposition. To the contrary, "Whether to grant relief based on rescission 'generally rests upon the sound discretion of the trial court exercised in accord with the facts and circumstances of the case [citations].'" (*Wong v. Stoler* (2015) 237 Cal.App.4th 1375, 1387.) "The unclean hands doctrine protects judicial integrity and promotes justice. It protects judicial integrity because allowing a plaintiff with unclean hands to recover in an action creates doubts as to the justice provided by the judicial system. Thus, precluding recovery to the unclean plaintiff protects the court's, rather than the opposing party's, interests." (*Kendall-Jackson Winery, Ltd. v. Superior Court* (1999) 76 Cal.App.4th 970, 978.)

Substantial evidence supported the trial court's application of the doctrine to bar rescission here. The District introduced exhibits showing Westlake and Sandridge concealed the 2014 deal from the District, particularly those provisions requiring Westlake to obtain written consent before assigning the Lease

17

and to pay additional rent.  Howe acknowledged these provisions in a 2014 email to Sandridge.  He wrote:  "We show Westlake having a 51% and Sandridge 49% interest in the lease.  We did this to eliminate the Sanitation District from having any participation in the transfer.  If Westlake were to transfer more than 50% ownership in the lease, the Sanitation District has the right to deny the transfer or would take one half of the declared value of the lease.  We are doing this for convenience and not meaning to ultimately change how the land and water would be managed in the end."

Westlake and Sandridge signed a memorandum of understanding three months after Howe sent this email.  The memorandum stated:  "You could call this a 'Side Agreement' because it has the intent of documenting some understandings that are not necessarily covered in any of the other agreements." It described the transaction as "particularly complicated due to factors beyond the control of the parties."  These factors included a pending judgment against Sandridge and "contracts such as the Sanitation contract and others."  The memorandum's final sentence forthrightly concludes, "[T]he agreements may state that the interest  in the Sanitation lease is 49%.  The real interest is effectively 80%."  The trial court exercised its discretion properly when it found these efforts to conceal the deal's terms barred "any award in equity."  (See *Burton v. Sosinsky* (1988) 203 Cal.App.3d 562, 573 [doctrine of unclean hands "'is a self-imposed ordinance that closes the doors of a court of equity to one tainted with inequitableness or bad faith

18

relative to the matter in which he seeks relief, however improper may have been the behavior of the defendant'"].)[3]

DISPOSITION

Judgment is affirmed. Neither party prevailed on their appeal. The interest of justice are best served by requiring each side to bear their own costs on appeal.

NOT TO BE PUBLISHED.

CODY, J.

We concur:

GILBERT, P. J.

YEGAN, J.

---

[3] The trial court's statement of decision on equitable issues applies the doctrine of unclean hands in the section denying Westlake's claim for unjust enrichment. The doctrine applies with equal force to the rescission claim. Westlake's dealings with Sandridge figure prominently in its analysis of both issues.

19

Barry T. LaBarbera, Judge

Superior Court County of San Luis Obispo

_____

Reed Smith, Kathryn M. Bayes, Raymond A. Cardozo, Brian A. Sutherland, for Plaintiffs, Respondents, and Cross-Appellants

Greines, Martin, Stein & Richland, Robin Meadow, Cynthia E. Tobisman, Gary J. Wax, and Stefan C. Love; Lewis Brisbois Bisgaard & Smith, Wesley G. Berlin, Daniel G. Bath, and Jessica A. Lienau; Griswold, LaSalle, Cobb, Down & Gin, Robert M. Dowd, Raymond L. Carlson, and Christina G. Di Filippo; Beveridge & Diamond, Jacob P. Duginski, James B. Slaughter (pro hac vice) and Eric L. Christensen (pro hac vice), for Defendant, Appellant, and Cross-Respondent.